**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN I. SALOMON, | ) | |
| | ) | Case No.: 07 C 4785 |
| Plaintiff, | ) | |
| v. | ) | Judge Rebecca R. Pallmeyer |
| | ) | Magistrate Judge Michael T. Mason |
| LECG, LLC, | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Plaintiff, John I. Salomon ("Salomon"), by his attorneys, hereby moves for the entry of an order compelling defendant, LECG, LLC ("LECG"), to search for and produce a clearly-defined set of documents responsive to Salomon's Requests for Production of Documents. In support of this Motion, Salomon states as follows:

**I.    INTRODUCTION**

**A.    Salomon's Claims**

1.    Salomon initiated this action against defendant, LECG, LLC ("LECG") to obtain various compensation due him, totaling several hundreds of thousands of dollars. Salomon asserts claims for breach of contract and the Illinois Wage Payment and Collection Act.

2.    As set forth in Salomon's First Amended Complaint (the "Complaint"), at the inception of his employment with LECG in June of 2004, Salomon executed a Director Agreement setting forth the terms and conditions of his employment (the "Director Agreement"). Pursuant to that Director Agreement, Salomon was engaged by LECG as "the Managing Director of the National Forensic Accounting Practice within LECG, providing both leadership and management of the practice."

3.    At all times, the terms of Salomon's employment under the Director Agreement (as amended) provided that if he resigned for "*Good Reason*" – specifically including a material adverse change in his duties, responsibilities and/or position –Salomon then would be entitled to payment of defined compensation and benefits under the Agreement following such a "Good Reason" resignation.   After presenting LECG with written notices and opportunity to cure (which LECG failed to do), Salomon resigned for "Good Reason," effective August 17, 2007.

4.    LECG since has denied that Salomon had "Good Reason" to resign under the Agreement.   Based on its assertion that Salomon did not, in fact, have "Good Reason," LECG wrongly has withheld several hundreds of thousands of dollars owed to Salomon.[1]

**B.    LECG's Untimely And Incomplete Production of Limited Discovery Responses**

5.    The parties presented an initial scheduling order with short dates.   When it became apparent that the Court's initial Scheduling Order would prove unworkable due to defendants' failure to timely produce discovery responses, Salomon was required to file a Motion to Amend the Court's Scheduling Order and Extend Discovery Dates, in order that he could receive the relevant documents from LECG responsive to Salomon's First Set of Requests for Production of Documents (the "Document Requests"), served on October 26, 2007.

6.    As Salomon indicated in said Motion, though he has attempted to move this matter along swiftly, LECG's failure to timely produce basic documentation – which LECG notably had agreed to produce – has stymied his efforts.   In response to the Motion, LECG argued that the case management dates should not be extended as requested, purportedly on the

---

[1]    In her letter to Salomon dated August 15, 2007, LECG's General Counsel, Ms. Carol Kerr, explained (under a heading titled "Signing Bonus") that LECG has withheld at least $642,408.68 in direct relation to his resignation, as LECG considered these sums to be "forfeited" by Salomon. While there is no question that Salomon thus is owed considerable amounts, he presently is unable to quantify precisely *how much*, in fact, is owed to him relative to additional/related client collections and write-offs, etc., as LECG has failed to provide sufficient accounting information – a subject of this Motion, addressed below.

grounds that LECG would promptly produce relevant documentation. On January 3, 2008, this Court granted Salomon's Motion and extended the discovery dates in this matter.

7.      Since the January 3rd hearing (as before), LECG continuously has failed to produce relevant documents as required, despite repeated demands by Salomon in an effort to obtain LECG's compliance. Indeed, not until February 26th did LECG tender the last of what it believes to be its initial round of production – under LECG'S overly-narrow and skewed view of what is "relevant", as discussed below. (See Exhibit A; LECG's February 28, 2008 correspondence summarizing LECG's document production; note that of the 13 agreed-upon custodians, LECG did not even produce initial documentation for five (5) of them until after February 20, 2008.) [2]

8.      Furthermore, from what LECG has produced to date it is clear that the documents LECG has "agreed" to produce fall well short of what must be produced under the FRCP. As set forth below, time and time again Salomon has communicated clearly with LECG to advise precisely what documents / information / custodians are relevant – explaining each time precisely why they are relevant – yet LECG staunchly has refused to produce required documents. Having exhausted reasonable efforts to obtain LECG's compliance with its

---

[2] Though LECG has produced initial documentation, LECG notably has admitted that its production/document-review – under its own view of what is required – still is not yet complete. Additionally, LECG acknowledges that it now is conducting a second-pass review of the voluminous documentation that apparently has been withheld from the initial production to Salomon, in order, *inter alia*, to prepare a privilege log. At one point, LECG "inadvertently produced" **4,225** pages of "privileged" documents (i.e. LECG-0000001-LECG 0004225), which Salomon then returned without reviewing; LECG also identified other "gaps" in its early production of another 8,000+ documents which "will be entered on Defendant's privilege log" according to LECG. (See Exhibit A; February 28, 2008 letter / summary production chart.) Further, most privileged documents were not reflected on LECG's log at all, and thus Salomon has no idea how many pages are being reviewed. What is clear is that LECG's privilege log may be weeks away (if not longer), and LECG acknowledges that additional documents may later be produced to Salomon if/when LECG determines that such document are not, in fact, privileged.

discovery / production requirements under the FRCP, Salomon must hereby present this Motion to Compel in order to obtain the discovery materials which are squarely relevant to his claims.[3]

## II.    ARGUMENT[4]

9.    Since serving his Document Requests, Salomon consistently has attempted to work with LECG to identify reasonable mechanisms to enable LECG to efficiently produce its responsive documents.  In this regard, on November 26th the parties agreed upon a narrow list of "search term" – or "keywords" – to be searched for custodians' computers.  (See Exhibit B; November 26, 2007 email exchange.)

10.    Salomon and LECG ultimately agreed to apply the agreed-upon keyword search-list to a mere 13 custodians (out of approximately 1000 LECG employees).  Thus, by way of illustration, the computer files of "Jane Doe" would be searched for the phrase "Salomon" within 100 words of "Good Reason."  By reaching agreement with LECG on these initial search terms/criteria, Salomon attempted to drastically minimize the initial "burden" or "cost" LECG asserted it might incur by conducting a wider search of its computer files.  Namely, rather than search its entire computer system for documents relevant to this case, LECG instead simply could run the defined key-word search with respect to the handful of specified custodians.

11.    Unfortunately, LECG has turned on its head Salomon's good-faith efforts to define the narrow search criteria.  LECG is now restricting its search criteria/efforts far beyond that on which Salomon might ever have agreed – which well short of what the FRCP requires.

---

[3]    Pursuant to Local Rule 37.2, the undersigned counsel has personally consulted with LECG's California counsel in good faith with respect to the discovery issues raised herein.  In addition to multiple telephone conferences, the undersigned has exchanged detailed correspondence with LECG's counsel addressing each of the discovery issues raised herein.  (See attachments to Motion.)

[4]    Salomon respectfully requests that the instant Motion, slightly in excess of 15 pages, be considered in its entirety *instanter*.  The Motion slightly exceeds 15 pages only because Salomon has quoted the relevant correspondence / materials at length in the Motion itself for the Court's convenience – rather than merely refer the Court to the voluminous emails/correspondence that are (and further could be) attached hereto.

## A.    FRCP REQUIRES BROAD PRODUCTION OF RELEVANT DOCUMENTS

12.    The FRCP provides for broad discovery of documents that are directly relevant themselves and/or which may lead to the discovery of relevant materials. See, e.g., Am. Hardware Mfr. Ass'n v. Reed Elsevier, Inc., 2007 U.S. Dist. Lexis 39639 at *9 (N.D. Ill. 2007) (unpublished)[5]; Kodish v. Oakbrook Terrace Fire Prot. Dist., 235 F.R.D. 447, 449-50 (N.D. Ill. 2006).    Rule 26(b)(1) broadly states that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense ... For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action." Fed. R. Civ. P. 26(b)(1).  In ruling on a motion to compel, "courts have consistently adopted a liberal interpretation of the discovery rules," treating any request for discovery as relevant "if there is *any possibility* that the information sought may be relevant to the subject matter of the action." Kodish, 235 F.R.D. at 450 (emphasis added); see Am. Hardware Mfr. Ass'n, 2007 U.S. Dist. Lexis 39639 at *22-23 (observing that "Rule 26 permits comprehensive discovery, and relevance is construed broadly," in granting the motion to compel).   Thus, a broad scope of discovery is presumed, unfounded discovery restrictions are disfavored, and the party opposing any discovery request bears the burden of demonstrating why that particular request is improper under the FRCP. See id.

13.    Salomon's document requests fall well within the parameters of what is "relevant" and thus required of LECG in this case.  Indeed, as set out below, LECG's own information/explanations/documents evidence precisely why this Motion should be granted and LECG should be compelled to produce the subject materials to Salomon.

---

[5] For the Court's reference, a copy of the decision is attached hereto as Exhibit C.

**B.**     <u>**CUSTODIANS** – **LECG HAS REFUSED TO SEARCH FOR REQUISITE DOCUMENTS FROM CRITICAL LECG EMPLOYEES / CUSTODIANS**</u>

    **i.**     <u>**MSSRS. COLTON, ANASTASI , AND ELSON**</u>

14.     LECG repeatedly has refused to search the documents of Mssrs. Colton, Elson and Anastasi – three critical witnesses – for any time prior to January 1, 2007.[6] There simply is no basis for LECG to arbitrarily impose the January 1, 2007 date restriction – which was just months prior to Salomon's resignation – for these three key witnesses, while agreeing to search the full relevant time period for the other agreed-upon custodians.

15.     As its supposed "support" for imposing date restrictions and refusing to search all of the relevant documents for these three key custodians, LECG has asserted that these custodians could <u>only</u> be relevant during the year of 2007, because that is when Salomon ultimately gave his "Good Reason" resignation notice. Salomon has explained why LECG's position is without merit and why the January 1, 2007 search start-date is overly-restrictive::

> "I absolutely disagree with your assertion that I did not provide a reason to search prior to January 1, 2007 for Mssrs. Colton, Anastasi and Elson. I specifically discussed during our last call that, among other things, any discussions/communications regarding what Mr. Salomon's duties/etc. **WERE** are inherently relevant to what they **BECAME**, for purposes of the "Good Reason" termination analysis. This reason alone would require expanding the search to before January 1, 2007."

(<u>See</u> Exhibit D; January 10, 2008 email; emphasis in original.) Salomon then later reiterated precisely why this group of document custodians should not be subject to unique/limiting date-search parameters, as compared to other custodians:

---

[6]     LECG recently relented a bit on the search dates as to Mr. Colton – moving the initial search date to February 1, 2006 – but has not agreed to alter the search dates as to Mssrs. Colton or Elson or to search prior to February 1, 2006 for Mr. Colton. LECG's agreement as to Mr. Colton does not resolve the dispute on his documents either, as his search still is truncated, and the full-date range should be searched.

"The interaction of these individuals relative to Mr. Salomon's job duties and responsibilities -- as well as LECG assignment of duties in a manner inconsistent with Mr. Salomon's contract and supposed duties thereunder -- are relevant insomuch as they bear on what Mr. Salomon was assigned to do (or later was not assigned to do) under his employment contract, and how those changing duties were re-assigned within LECG. The shifting duties may have culminated in 2007, but very well could have begun before that time. For these three individuals in particular, any discussions, assignments of duties and responsibilities, etc. would all bear directly on Mr. Salomon's claims. They are not only relevant themselves – but might have information leading to relevant information (which, of course, is the standard) – and should be included in the full search."

(See Exhibit E; January 28, 2008 email of 5:35 p.m.)

16. Despite Salomon's description of the relevance of these individuals – indeed, their critical involvement as key players in the "Good Reason" termination analysis – LECG has refused to search their records over the full relevant period. So, time and again, Salomon has reiterated the central relevance of these custodians in an effort to obtain LECG's discovery compliance. Salomon has explained in writing to LECG (about its own employees) as follows:

### MR. COLTON:

"With respect to Mr. Colton, he and Mr. Salomon worked worked extensively on acquisitions on behalf of the firm since 2005. He also was the contact point for financial projections for modification to Mr. Salomon's contract. He very well may have critical information relative to Mr. Salomon's various roles, duties, titles, and responsibilities in the firm, as well as related compensation issues." (See Exhibit F; January 27, 2008 email of 12:07 p.m.)

\*\*\*\*\*\*\*\*\*\*\*\*

"Mr. Colton would have information as to Mr. Salomon's prior roles, titles, responsibilities and duties. He also prepares drafts of new/proposed contracts and is involved with setting various financial terms." (See Exhibit E; January 28, 2008 email of 5:35 p.m.)

\*\*\*\*\*\*\*\*\*\*\*\*

"Mr. Colton interacted with Mr. Salomon on a regular basis throughout Mr. Salomon's employment with LECG. In addition, Mr. Colton – including in his capacity of Director of Finance with LECG – prepared numerous analyses for senior management and very well could have prepared documents or maintained/received records relating to Mr. Salomon, including as bore on his duties, responsibilities and role within LECG. Pursuant to the applicable FRCP Rule

26 standards, there is no basis for curtailing the search of Mr. Colton's documents by imposing a February 1, 2006 parameter." (See Exhibit G; February 14, 2008 correspondence to R. Morris.)

## MR. ELSON:

"Mr. Elson is the office manager for Chicago. Mr. Salomon had been located at the Chicago office since December, 2005. He could possess various documents and communications related to Mr. Salomon's duties and responsibilities, including but not limited to how they changed over time." (See Exhibit F; January 27, 2008 email of 12:07 p.m.)

************

"Mr. Elson, as office manager, may very well have been involved in communications regarding Mr. Salomon's duties and responsibilities as a member of that office. I disagree that it could only be "tangential" at best; instead, it could bear directly on Mr. Salomon's claims. Further, Mr. Elson also served on both the executive management committee and the executive management team. He was designated by LECG as the point person for inquiries and very well could have been involved in communications regarding Mr. Salomon (and/or regarding the duties/roles of others, as would bear on Mr. Salomon's position) and his role within the company." (See Exhibit E; January 28, 2008 email of 5:35 p.m.)

************

"Mr. Elson – Mr. Elson was (and I believe still is) the office director for Chicago's LECG office, where Mr. Salomon worked from December 2005 through the last day of his LECG employment. As the office director, Mr. Elson maintained overall responsibility for all matters in Chicago. There can be little doubt that he falls squarely within the scope of Rule 26 – meaning that he may possess documents which are either relevant themselves or which lead to relevant information. Once again, I must underscore that we have reached *agreement* upon the narrow list of search terms – it is now just a matter of running those terms through Mr. Elson's computer files." (See Exhibit G; February 14, 2008 correspondence to R. Morris; emphasis in original.)

## MR. ANASTASI:

"Mr. Anastasi has held himself out as the global head of the Forensic Analytics practice -- i.e the forensic accounting practice. The relevance/need for these emails is self-evident, it would seem." (See Exhibit F; January 27, 2008 email of 12:07 p.m.)

************

"Mr. Anastasi has been involved as representing himself as the Head of the Practice, and he had significant and on-going conversations with management as to the direction and thrust of the practice throughout Mr. Salomon's time at LECG. His communications concerning the practice -

- and thus Mr. Salomon's position therein -- are certainly relevant." (See Exhibit E; January 28, 2008 email of 5:35 p.m.)

**\*\*\*\*\*\*\*\*\*\*\*\*\***

"Mr. Anastasi – throughout the period of Mr. Salomon's employment at LECG Mr. Anastasi held *himself* out as the Leader of the Forensic Analysis practice at LECG, whereas Mr. Salomon was to lead the National Forensic Accounting Practice. As such, communications involving and other documentation concerning or maintained by Mr. Anastasi are unquestionably relevant. As you are well aware, the very heart of the case concerns whether Mr. Salomon had "Good Reason" to terminate his employment due to a change in his role with LECG. I don't see how you could object in good faith to the further search of Mr. Anastasi's files. If you have a basis for explaining why his documents may not even potentially be relevant, please provide it. To this point, you have not provided any legitimate basis for failing to review his files – under the narrow search-term parameters upon which the parties expressly negotiated and agreed." (See Exhibit G; February 14, 2008 correspondence to R. Morris.)

17.     There is no good-faith basis for LECG to arbitrarily impose restrictive date parameters as to these three key witnesses/custodians. As the above descriptions reveal, these gentleman are critical witnesses in this case, as they go to the central dispute for Salomon's claims – namely, the evolution / re-assignment of Salomon's job duties over time. It is critically important that their documents in particular be searched for the full period (for which LECG has agreed to all other custodians).

### ii.     MR. WESTERMAN

18.     As explained above, Salomon was hired as the "Managing Director of the National Forensic Accounting Practice." This case centers on whether Salomon had "Good Reason" to resign following a material change in his job duties.

19.     To address the changing job duties, Salomon repeatedly has requested that LECG search the records of Mr. Westerman – *the very person who took over leadership of the forensic accounting practice group from Mr. Salomon.* Despite the obvious relevance of Mr. Westerman's transition into the Managing Director position held by Salomon, for **five (5)**

months LECG was "investigating" whether it would agree to search Mr. Westerman as a custodian whose document might be searched.

20.     Remarkably, LECG recently has advised that it refuses to search Mr. Westerman's documents, on the basis that he did not *formally* take over the Managing Director position in question until after Salomon's resignation.  On this point, LECG asserts: "Even if Plaintiff is correct that Mr. Westerman assumed leadership of the forensic accounting practice group following Plaintiff's resignation, LECG disputes that this 'fact' would provide a basis for a search of Mr. Westerman's electronic data, particularly given the substantial burden and expense associated with review of such data."

21.     LECG's position is without merit.  Mr. Westerman's relevance is apparent on its face – namely, Mr. Westerman was the very person tapped by LECG to take over Salomon's position as Managing Director; again, it was the transition of Salomon's job duties – later culminating in his replacement – which gave rise to his "Good Reason" resignation and thus forms the cornerstone of Salomon's current claims.  Accordingly, all communications to and from Mr. Westerman regarding his expected change in duties/role clearly are relevant to LECG's intentions regarding the changes in Salomon's role – as both men were tagged to "lead" the very same practice group.

22.     Salomon has explained Mr. Westerman's obvious relevance to LECG repeatedly. For example, Salomon has explained:

> 'You have ... refuse[d] to search the records of Mr. Westerman -- the very individual who took over leadership of the forensic accounting practice group from Mr. Salomon -- and you refer me to your letter of "February 21" [sic -- 20] in this regard; in that letter, you assert that Mr. Westerman may not be relevant and that it would be "costly and burdensome" to review his documents. These objections to fully searching Mr. Westerman's files/documents are wholly without merit. In this regard, while Mr. Westerman's relevance is apparent on the face of it, I refer you expressly to another document which LECG has produced which I trust will settle the point. Specifically, see

LECG-E0164081, a document from February of 2007 -- and thus well prior to Mr. Salomon's cessation of employment -- in which Messrs. Colton and Teece reference discussions about "*XXXXXXXXX – REDACTED PER PROTECTIVE ORDER; TO BE SUBMITTED TO COURT SEPARATELY - XXXXXXXXX*) [7] Thus, Mr. Westerman did not become relevant only after Mr. Salomon resigned, as you repeatedly have suggested is the basis for refusing to search Mr. Westerman's document. Rather, Mr. Westerman's relevance prior to Mr. Salomon's departure is evident, and can not be feasibly be denied. Accordingly, we again renew our request that LECG immediately search Mr. Westerman's documents over the full period we have requested.

(March 6, 2008 email at 3:16 p.m. – per Protective Order, **not** attached hereto – see footnote 7.)

23.     As referenced in the preceding block-quote, the very documents produced by LECG itself settle the issue as to Mr. Westerman.  Specifically, LECG has produced a document dated February of 2007 – and thus well prior to Mr. Salomon's resignation – in which Mr. Westerman's direct relevance to the change of Mr. Salomon's duties is unquestionable. (LECG-E0164081 – *marked "Confidential" by LECG and subject to Protective Order; to be produced separately for the Court's review* (see footnote 7).)

24.     LECG has attempted to ignore the relevance of this critical document and Mr. Westerman's relevance generally, asserting that LECG should not be required to conduct any search of Mr. Westerman's computer documents.  LECG argues that the key email (i.e. LECG-E0164081 (see footnote 7)) does not necessarily reflect on its face that Mr. Westerman ultimately received it.  LECG's very objection proves the point:  because LECG has not fully provided relevant documents, Salomon does not know what Mr. Westerman might have sent/received relative to his job duties and/or the assumption/transition of Salomon's job duties. All Salomon does know at this point – given LECG's refusal to search the documents – is that

---

[7]     The text of the relevant document was quoted in the correspondence to LECG counsel, but has been redacted from the body of this Motion in order to comply with the governing Protective Order, which does not permit the public filing/disclosure of the material. (See Docket Entry No. 22.) Pursuant to Section 7.2(d) of said Protective Order, the undersigned counsel can submit a copy of said document (i.e. LECG-E0164081) to the Court for its proprietary review, and is be prepared to do so in connection with presentation of this Motion.

Mr. Westerman is a key witness and there is no basis for refusing to search his files using the parties' limited and agreed-upon word search criteria.

25. Furthermore, and contrary to LECG's lone suggestion, whether Mr. Westerman received <u>this</u> <u>same</u> document (i.e. LECG-E0164081) is not the test of his relevance under Rule 26. Rather, the question is whether Mr. Westerman might have sent/received/created documents which are relevant themselves, or which may lead to the discovery of admissible evidence. Fed. R. Civ. P. 26. Given both the fact that LECG management was discussing Mr. Westerman's transition into Salomon's role *prior* to Salomon's departure, and the fact that Mr. Westerman *did* ultimately assume Salomon's job upon his departure, there is no good-faith basis for LECG's refusal to fully search Mr. Westerman's records.

## C. **ACCOUNTING PERSONNEL**

26. Salomon asserts that LECG has wrongfully withheld monies owed to him. The bulk of that money stems from LECG's failure to pay him money owed on the grounds that he supposedly did not have "Good Reason" to resign. Salomon maintains further that LECG has failed to pay him other wages owed, in violation of both his Agreement and the Illinois Wage Payment Act. (<u>See</u> First Amended Complaint.)

27. Salomon has received various accounting summaries – titled "Summary Salomon Final Settlement" – which purport to provide a breakdown of the monies owed to (and withheld from) Salomon on a client-by-client basis.[8] These "Final Settlement" statements are Excel spreadsheets which contain a number of "tabs" of information compiled by LECG when calculating the monies it asserts are presently due to Salomon (and which will become due to Salomon as client receivables are collected).

---

[8] A true and correct copy of the "Summary Salomon Final Settlement January 8" can be submitted separately to the Court for its review, as it has been marked "Confidential" by LECG and thus can not be publicly filed under the terms of the pending Protective Order.

28.     From the outset, Salomon has identified LECG's accounting personnel as relevant custodians, and repeatedly has advised LECG that accounting records should be searched. LECG has claimed that the accounting records should not be searched, unless/until Salomon could identify any basis to suggest why accounting personnel might be relevant.

29.     Salomon clearly and repeatedly <u>has</u> identified a basis for searching LECG's relevant accounting documents.  Specifically, Salomon most recently explained:

> As I have always maintained, we have every right to see the accounting information -- including back up documentation -- pertaining to the calculation of what information, in fact, LECG believes is payable to Mr. Salomon and what information LECG has withheld.  Moreover, with specific reference to the search of accounting department custodians/records, we have taken issue -- repeatedly -- with the accounting figures that LECG has provided.  Thus, the records of the subject accounting department employees should be searched immediately.
>
> In particular, I have advised you previously that we do take issue with the nature/accuracy of the Accounting Records, as there are disputes over the withheld business development costs, charge-backs, write-offs, etc.  In this regard, I specifically refer you to LECG's own monthly summary spreadsheet titled "Summary Salomon Final Settlement January 8" -- which you provided to us.  That LECG spreadsheet contains various "tabs" of information.  The "Bonus" tab -- which obviously goes to the wage/payment issues at the heart of this litigation -- contains multiple "screen shots" of actual email exchanges between LECG employees, specifically concerning the calculations of money payable to Mr. Salomon.  All of the accounting individuals I have identified -- namely, *Chad Keller, Neil Roscoe, Amanda Casey, Dean Prater, John Rich, and Cynthia Chen* -- are included/involved in communications which are the basis of the payment spreadsheet for monies payable to Mr. Salomon.  In sum:  I can not imagine that you will need any further information as to the relevance of these individuals -- they are referenced in LECG's own documents as participating in the most recent calculations/communications regarding what money is owed to Mr. Salomon.

(March 6, 2008 email of 3:16 p.m. – per Protective Order, **not** attached hereto – <u>see</u> footnote 7.)

30.     With respect to the search of the accounting records, Salomon further has described exactly which specific client-account terms should be incorporated into the custodian search in order to generate only direct search "hits" which are relevant to this case:

> I described in my March 1st email to you a list of unique keywords relating to client account names -- e.g. "cvdyn-26733" -- which form the basis of Mr. Salomon's

compensation (and/or withholdings therefrom) as set forth in LECG's own February monthly statement which you provided to us. As I previously asserted, these unique account-name terms should also be used as keywords in the document searches. To be clear, these unique phrases (e.g. cvdyn-26733) should be searched <u>both</u> as to the accounting personnel <u>and</u> all of the other named computer-search custodians. I do not believe you have responded as to this point regarding application of these unique search terms. Again, because these are unique, stand-alone phrases (e.g. cvdyn-26733) which would produce only "direct hits" and which relate directly to payment/withholding on Mr. Salomon's compensation, we maintain that LECG should run said search promptly. Please advise if you will run the search accordingly.

(March 6, 2008 email of 3:16 p.m. – per Protective Order, **not** attached hereto – <u>see</u> footnote 7.)[9]

31.     Finally, it is important to emphasize that LECG's very own pleadings in this case underscore why the accounting records unquestionably are relevant.   Specifically, in his Interrogatories, Salomon inquired of LECG, *inter alia*, as to who was "responsible for the production and accuracy" of the Final Settlement reports reflecting monies owed to Salomon, and who "prepared and/or contributed data to – and/or otherwise participated in – the compilation or preparation of said reports." In response, just days ago LECG unequivocally admitted as follows:

> "Defendant's Accounting Department is responsible for preparing the reports. Staff Members within the Accounting Department with responsibilities relating to general accounting, expert accounting, payroll, and project accounting/collections **all contribute** to the reports."

(<u>See</u> Exhibit H; Interrogatory Answers of LECG; Interrogatory No. 3.; emphasis added.)

32.     Furthermore, it is wholly disingenuous for LECG to suggest that Salomon is not entitled to question the accuracy of LECG's accounting/payments/withholdings/deductions. Indeed, since this Lawsuit was filed, LECG already has admitted on one occasion that the amount of "forfeiture" was "incorrectly determined" due to an accounting error, purportedly by

---

[9]     From the documents received to date, Salomon has been able to initially ascertain that Shelly Sparks, Michael Wagner, Tracey Willaby, Chad Keller, Neil Roscoe, Amanda Casey, Dean Prater, John Rich, and Cynthia Chen were all specifically identified in the Final Settlement Statement – including through their own respective emails attached thereto – as accounting department individuals who participated in the calculation of monies owed to Salomon.

the company's third-party administrator; this "error" – by LECG's own written admission – cost Salomon $109,073.59, and LECG's payroll department finally "rectifi[ed]" the situation later by sending Salomon a check for that full amount in October, 2007.

33.     In sum, from the very documents and pleadings that LECG itself has produced/served, the accounting "mistakes" it has admitted, and in light of Salomon's fundamental claims over monies owed to him, LECG simply can not assert in good faith that Salomon does not have a right to obtain relevant accounting records identifying what monies LECG believes are actually owed to (and/or withheld from) him, and how LECG calculated those figures.

34.     Furthermore, the records of the other agreed-upon custodians should be searched in connection with the same unique client-account terms (e.g. cvdyn-26733) as reflected on LECG's "Final Settlement" statement, and given said unique search terms such a search would generate only "hits" directly relevant to Salomon's claims in this case.

**D.     METADATA AND BACK-UP TAPES**

35.     Rule 34(a)(1)(A) of the FRCP provides that a party may serve upon the other party a request for "any designated documents or electronically stored information - including writings, drawings, graphs, charts, photographs sound, recordings, images, and other data or data compilations - stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form..." Rule 34(b)(1)(C) further states that the request "may specify the form or forms in which electronically stored information is to be produced." The plain text of FRCP, therefore, expressly permits the requesting party to specify the form of production sought. Fed. R. Civ. P. 34(b)(1)(C); see, e.g. D'Onofrio v. SFX Sports Group, Inc., 248 F.R.D. 43, 47-48 (D. D.C. Jan. 23,

2008) (interpreting Rule 34(b) as the legal foundation entitling the requesting party to the metadata accompanying the electronic documents, if the party makes a request for such metadata).

36.    In this case, there is no dispute Salomon's Requests for Production specifically defined relevant "documents" to include back-up tapes / metadata.  Nor is there any dispute that Salomon since has insisted that LECG search back-up tapes / metadata.  Yet LECG has refused to do so, in contravention of the FRCP and Salomon's specific requests.

37.    Metadata unquestionably is a relevant area of discovery, and it is disingenuous for LECG to argue that the production of its metadata is not relevant/required.  LECG's own words – taken directly from LECG's Website under "Electronic Discovery" – speak volumes:

- "Electronic discovery is no longer something that businesses can ignore and lawyers can deal with in smoking gun emails"

- "Only ten percent of an organization's electronic information is accessible by simple means. At a time when guilt, liability, or vindication is often established by circumstantial evidence such as bid patterns, travel and expense records, telephone records, business diary entries, email, voice mail, or 'deleted' computer files, it is critical to access and control the other 90 percent."

- "Our experts specialize in locating and collecting large volumes of data that are the subject of disputes, investigations, and litigation."

(See Exhibit I; print-outs from LECG's Website.)  LECG publicizes that it is company built on "experts specializ[ing] in" the retrieval of the very data LECG now refuses to produce.  Its complaints about searching back-up tapes and metadata are disingenuous and at odds with its own pronouncements on the subject.  Indeed, if ever there were a corporate defendant uniquely qualified to search back-up tapes and metadata materials, it is LECG.

38.    Furthermore, though no further relevance need be proven here, it is clear that specific reason, in fact, exists to conduct such searches in this case.   Salomon has identified with particularity how/why the back-up tapes and/or metadata are relevant in this case, explaining for example that a key figure – Mr. Kaplan – *deleted* his emails and that such emails now are available only through the back-up files:

> It remains our position that the back-up tapes are required to be searched under the Federal Rules (just as metadata is required, as was expressly set forth in our Requests to Produce).  Although I do not need to explain again in greater detail why the back-up tapes might contain relevant information (as you have again requested), a single example illustrates the point.  It seems that [a single document – and no emails] were produced relative to David Kaplan -- former President of the Company -- over a 4 year period, despite the fact that Mr. Kaplan negotiated terms with (and otherwise communicated with) Mr. Salomon, including by email … [A] search of the back-up tapes likely would reveal additional emails / communications which constitute very relevant / important documentation relating directly to contract/negotiations/communications/etc. that are at the heart of this case.  In other words, though Mr. Kaplan may have "deleted" most emails from his own system, such "deleted" emails should remain available on LECG's back-up tapes.  Once again, we have been very clear from the start – including in the Requests to Produce themselves – that all such back-up tapes (with respect to Mr. Kaplan and other custodians) should be searched and the corresponding relevant materials produced.  (In similar regard, we dispute your sweeping contention that metadata is not relevant and that it need not be searched/produced.)

(March 6, 2008 email at 3:16 p.m. – per Protective Order, **not** attached hereto – see footnote 7; see Exhibit J, March 6, 2008 email at 3:40 p.m.)

39.    Remarkably, LECG suggests that Mr. Kaplan's deleted items need not be searched because the documents LECG produced for other custodians show more than 1,000 documents sent to/from Mr. Kaplan; LECG suggests that this documentation from others sufficiently reflects Mr. Kaplan's involvement.  Just the opposite is true:  this fact shows that Mr. Kaplan routinely received directly-relevant documents, but yet he has produced nothing himself – because his materials were "deleted."  Perhaps Mr. Kaplan sent critical emails concerning Salomon's changing job duties to others who are not on the agreed-upon custodian list.  And who else, in addition to Mr. Kaplan, deleted materials that Salomon does not know about?  All

such documents would exist on the back-up tapes, have not been produced to Salomon, and would unquestionably be relevant – yet LECG is refusing to search for them because Mr. Kaplan (and others, presumably) "deleted" them off of the system and it would be "burdensome" to search the back-up tapes.

40.     In short, the documents LECG has produced unquestionably show that critical documents which *did* reside on the LECG custodian's own computer at one time do *not still* reside there, and thus such documents are not being produced by LECG.

41.     As a last ditch effort to avoid searching for metadata and the other files, LECG finally has asserted (in its March 4 correspondence) that it will not search back-up tapes because it may be too "burdensome" or "costly." Again, by its own account LECG is the leading expert in this area. Under LECG's approach, if it should not produce such materials for its own systems – with respect to a narrow handful of custodians, and using extremely narrow/agreed-upon search terms – then no company should have to do so, and the discovery rules for metadata would be rendered wholly ineffective.

## III.     CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Motion be granted and that LECG fully be required to produce documents as requested herein.

Respectfully submitted,

JOHN I. SALOMON

Dated: March 20, 2008

_____/s/_____

BY: William J. Tarnow, Esq.
One of his attorneys

- 18 -

William J. Tarnow, Esq.
Neal, Gerber & Eisenberg, LLP
2 N. LaSalle St., Suite 2200
Chicago, IL  60602
(312) 269-8489
E-mail:  wtarnow@ngelaw.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on March 20, 2008, a true and correct copy of **PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS**, was served upon the following via e-mail and U.S. First Class Mail, proper postage prepaid:

Risa Morris
Jennifer Salzman Romano
**Folger Levin & Kahn LLP**
1900 Avenue of the Stars, 28th Floor
Los Angeles, CA 90067
tlaffey@flk.com
rmorris@flk.com
jromano@flk.com

and

Marvin A. Tenenbaum
Adam M. Tenenbaum
**Tenenbaum & Tenenbaum, LLC**
150 N. Michigan Ave., 8th Fl.
Chicago, IL 60601
marvin@tenenbaumlaw.com
adam@tenenbaumlaw.com

/s/ William J. Tarnow

NGEDOCS: 1513558.3

# Exhibit A

FOLGER LEVIN & KAHN LLP

ATTORNEYS AT LAW

1900 Avenue of the Stars, 28th Floor
Los Angeles, California 90067
Telephone 310.556.3700
Facsimile 310.556.3770

February 28, 2008

San Francisco Office:
Embarcadero Center West
275 Battery Street, 23rd Floor
San Francisco, California 94111
Telephone 415.986.2800
Facsimile 415.986.2827

**VIA E-MAIL**

www.flk.com

William J. Tarnow
Neal, Gerber & Eisenberg
Two North LaSalle Street
Chicago, IL 60602

Re:    Salomon v. LECG, LLC

Dear Bill:

In response to your inquiry, I have prepared the following chart reflecting the Bates-ranges for the electronic documents produced to date:

| DOCUMENT RANGE | PRODUCTION DATE | DESCRIPTION |
|---|---|---|
| LECG-E000001-0004224 and LECG-E0004225 | | Removed by Party Agreement |
| LECG-E0004226-E0031897 | 12/22/07 | John Salomon documents |
| LECG-E0040937-E0096026 | 1/02/08 | Phil Rowley documents |
| LECG-E0096702-E0102550 | 1/03/08 | Elizabeth Devine documents |
| LECG-E0102551-E0143060 | 1/11/08 | Jack Burke documents |
| LECG-E0143080-E0143220[1] | 1/11/08 | John Salomon documents withheld from review due to references to Jeff Human |
| LECG-E0143223-E0163988 | 1/18/08 | Christopher Aitken documents |

---

[1] Cover letter misstated this range as LECG-E0143082-E0143136.

FOLGER LEVIN & KAHN LLP

William J. Tarnow
February 28, 2008
Page 2

| | | |
|---|---|---|
| LECG-E0163989-E0164127 | 1/29/08 | Geoff Colton documents |
| LECG-E0164128-E0164152 | 2/08/08 | David Kaplan document |
| LECG-E0164153-E0188329[2] | 2/08/08 | Michael Jeffrey documents |
| LECG-E0188330-E0194657 | 2/20/08 | David Teece documents |
| LECG-E0194658-E195385 | 2/22/08 | Joseph Anastasi documents |
| LECG-E0195386-E0209763 | 2/22/08 | Tina Bussone documents |
| LECG-E0209764 - E0212828 | 2/26/08 | Russ Dunlap documents |
| LECG-E0212829 - E0212898 | 2/26/08 | Craig Elson documents |

The documents falling in the following gaps were withheld and will be entered on Defendant's privilege log: LECG-E31898-40936 and LECG-E0096027-E0096701. I am investigating with the vendor to understand the following gaps: LECG-E0143061 to LECG-E0143079, and LECG-E0143221 to LECG-E0143222. I suspect these were unintentional, and will advise when I learn more.

Very truly yours,

Risa J. Morris

cc:     Jennifer S. Romano, Esq.

58023\5004\590653.1

---

[2] Some documents were identified as privileged and pulled from production after Bates labeling was complete, resulting in a few isolated gaps within this set, which will be identified on Defendant's privilege log. Cover letter misstated the Bates range as LECG-E0164128-E0186488.

# Exhibit B

## Tarnow, William J.

**Subject:**                          FW: Proposed Protective Order/Other Issues

-----Original Message-----
From: Risa Morris [mailto:rmorris@flk.com]
Sent: Monday, November 26, 2007 6:19 PM
To: Tarnow, William J.
Cc: Thomas Laffey; marvin@tenenbaumlaw.com
Subject: RE: Proposed Protective Order/Other Issues

Bill:

Thanks for your email.  We have no objection to the search terms you propose.  However, did you intend to propose a search for "Dsalomon"?  I think perhaps this was meant to be "Jsalomon".  Also, I am not familiar with the term "EPS", so please clarify what the long form of this term would be.

With respect to your reservation of rights regarding further search terms, we are not asking for a waiver of any rights with respect to use of additional search terms in the future.  However, it is our intention to agree on a mutually acceptable list of terms now in an effort to complete the review in a cost-efficient manner.  I understand from your message that you are still consulting with Mr. Salomon regarding additional search terms.  Please let us know if Mr. Salomon has any further terms he would like to include, so we may finalize the list.

Best regards,
Risa

>>> "Tarnow, William J." <WTarnow@ngelaw.com> 11/26/2007 7:51 AM >>>
Thank you, Risa:

I am still reviewing the items and coordinating with Mr. Salomon to propose a comprehensive list of search terms.  Please note, however, that any agreement as to a list of initial search terms should not be interpreted as any agreement or waiver by us to later expand that search criteria as appropriate (subject to whatever standard objections you might have as to relevancy, privilege, etc.)  Rather, the "list" will represent only the initial search terms upon which the parties have agreed, and we reserve all rights to later demand that the search be expanded as appropriate, subject to whatever substantive objections you might otherwise raise.  With this understanding, in the interim please conduct the search on the terms you have proposed and add the following search criteria as well (and please search words both in capitalized and lower case form if that impacts the search results on your system):

(1)    Search "Solomon" and "Salomon" and "Dsalomon" interchangeably

(2)    "EPS" (and the long form and any variations thereof) within 100 words of Salomon

(3)    "Earnings" within 100 words of Salomon

(4)    "Termination" within 100 words of Salomon

(5)    "Deferred compensation" within 100 words of Salomon

(6)    "Claw back" and "clawback" within 100 words of Salomon

(7)    "bonus" within 100 words of Salomon

(8)    "Leadership" within 100 words of Salomon

(9)    "Anastasi" within 100 words of Salomon



EXHIBIT
B

(10) "Westerman" within 100 words of Salomon

(11) "Rowley" within 100 words of Salomon


William J. Tarnow
Neal, Gerber & Eisenberg LLP
2 N. LaSalle Street, Suite 2200
Chicago, IL 60602
(312) 269-8489
(312) 429-3573 (fax)
wtarnow@ngelaw.com

www.ngelaw.com


CONFIDENTIAL NOTE

THIS E-MAIL TRANSMISSION AND ANY ATTACHMENTS HERETO CONTAIN INFORMATION FROM THE LAW FIRM
OF NEAL, GERBER & EISENBERG WHICH IS CONFIDENTIAL AND PRIVILEGED. THE INFORMATION IS
INTENDED FOR THE SOLE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED. IF YOU ARE
NOT THE INTENDED RECIPIENT, YOUR USE, DISSEMINATION, FORWARDING, PRINTING OR COPYING OF
THIS INFORMATION IS PROHIBITED.

TAX ADVICE DISCLOSURE

ANY TAX ADVICE CONTAINED IN THIS COMMUNICATION (INCLUDING ANY
ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF
(I) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE OR (II) PROMOTING, MARKETING OR
RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.


-----Original Message-----
From: Risa Morris [mailto:rmorris@flk.com]
Sent: Wednesday, November 21, 2007 5:21 PM
To: Tarnow, William J.
Cc: Thomas Laffey; marvin@tenenbaumlaw.com
Subject: Fwd: Proposed Protective Order/Other Issues

Bill:

Per Tom's email below, I am forwarding a list of proposed search terms:

Salomon [To be used as a search term for custodians other than John Salomon himself].
Executive Management Committee
EMC
EMC-* [The asterisk is a wildcard term, used here to capture words hyphenated after the
term "EMC"] *-EMC Executive Committee Executive Management Team Executive Team EMT
EMT-*
*-EMT
National Forensic Accounting Practice
National Forensic Accounting Group
Forensic Accounting Group
Forensic Accounting Practice
Concept [limited to documents dated after 1/1/2007] Sector [limited to documents dated
after 1/1/2007] "Director Agreement" within 100 words of "Salomon"
"First Amendment" within 100 words of "Salomon"

Please let Tom or me know if you have any questions or comments.

Best,
Risa


Risa J. Morris, Esq.
Folger Levin & Kahn LLP
1900 Avenue of the Stars, 28th Floor

# Exhibit C

LEXSEE 2007 US DIST LEXIS 39639



Analysis
As of: Mar 20, 2008

**AMERICAN HARDWARE MANUFACTURERS ASSOCIATION, Plaintiff, vs. REED ELSEVIER INC., et al., Defendants. REED ELSEVIER INC., a Massachusetts corporation, Counter-plaintiff, vs. AMERICAN HARDWARE MANUFACTURERS ASSOCIATION, a Delaware not-for-profit corporation, TIMOTHY FARRELL, and WILLIAM P. FARRELL, SR., Counter-defendants.**

**No. 03 C 9421**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2007 U.S. Dist. LEXIS 39639*

**February 13, 2007, Decided**

**SUBSEQUENT HISTORY:** Objection denied by *Am. Hardware Mfrs. Ass'n v. Reed Elsevier Inc., 2007 U.S. Dist. LEXIS 35352 (N.D. Ill., May 11, 2007)*

**PRIOR HISTORY:** *Am. Hardware Mfrs. Ass'n v. Reed Elsevier Inc., 2007 U.S. Dist. LEXIS 10603 (N.D. Ill., Feb. 13, 2007)*

**COUNSEL:** [*1] For American Hardware Manufacturers Association, a Delaware not-for-profit corporation, Plaintiff: William Patrick Farrell, Jr., LEAD ATTORNEY, Michael Anthony Nicolas, Scott Jared Fisher, Neal, Gerber & Eisenberg, Chicago, IL; Gordon B. Nash, Jr., Drinker Biddle Gardner Carton (IL), Chicago, IL.

For Reed Elsevier, Inc., a Massachusetts corporation, Defendant: Michael I. Rothstein, LEAD ATTORNEY, Karina H. DeHayes, Reema Kapur, Tabet DiVito & Rothstein, LLC, Chicago, IL; Benjamin J. Randall, Randall & Kenig LLP, Chicago, IL; John Matthew Fitzgerald, Rachel Nicole Cruz, Tabet DiVito Rothstein, Chicago, IL; Timothy A. Hudson, Jenner & Block LLP, Chicago, IL.

For Reed Exhibitions, a division of Reed Elsevier, Inc., Defendant: Michael I. Rothstein, LEAD ATTORNEY, Reema Kapur, Tabet DiVito & Rothstein, LLC, Chicago, IL; Benjamin J. Randall, Randall & Kenig LLP, Chicago, IL.

For Association Expositions & Services, a division of Reed Elsevier, Inc., Defendant: Michael I. Rothstein, LEAD ATTORNEY, Reema Kapur, Tabet DiVito & Rothstein, LLC, Chicago, IL.

For Freeman Decorating Company, an Iowa corporation, Freeman Decorating Services, Inc., a Texas Corporation, also known [*2] as The Freeman Companies, Defendants: Anthony Joseph Carballo, LEAD ATTORNEY, Aren Lance Fairchild, Garry L Wills, Freeborn & Peters, Chicago, IL.

For William P. Farrell, Sr., Third Party Defendant: Gordon B. Nash, Jr., Drinker Biddle Gardner Carton (IL), Chicago, IL; Scott Jared Fisher, Neal, Gerber & Eisenberg, Chicago, IL.

For Reed Elsevier, Inc., a Massachusetts corporation, Counter Claimant: John Matthew Fitzgerald, Rachel Nicole Cruz, Tabet DiVito Rothstein, Chicago, IL;

2007 U.S. Dist. LEXIS 39639, *2

Reema Kapur, Tabet DiVito & Rothstein, LLC, Chicago, IL.

For Timothy S Farrell, Counter Defendant: William Patrick Farrell, Jr., LEAD ATTORNEY, Michael Anthony Nicolas, Scott Jared Fisher, Neal, Gerber & Eisenberg, Chicago, IL; Gordon B. Nash, Jr., Drinker Biddle Gardner Carton (IL), Chicago, IL.

For William P. Farrell, Sr., American Hardware Manufacturers Association, a Delaware not-for-profit corporation, William P. Farrell, Sr., Counter Defendants: Michael Anthony Nicolas, Neal, Gerber & Eisenberg, Chicago, IL.

For Freeman Decorating Company, an Iowa corporation, Freeman Decorating Services, Inc., a Texas Corporation, Counter Claimants: Garry L Wills, Freeborn & Peters, Chicago, IL. [*3] ,

**JUDGES:** JAMES B. MORAN, Senior Judge.

**OPINION BY:** JAMES B. MORAN

**OPINION**

MEMORANDUM OPINION AND ORDER

Plaintiff American Hardware Manufacturers Association ("AHMA") brought suit against Reed Elsevier, Inc., Reed Exhibitions, and Association Expositions & Services (collectively "Reed"), and Freeman Decorating Co., and Freeman Decorating Services, Inc. (collectively "Freeman"), alleging various counts of common law and statutory breaches stemming from the breakdown of plaintiff's business relationships with defendants. [1] Subsequently, Reed filed counterclaims against AHMA and Timothy S. Farrell and William Farrell ("Farrells"). In April 2005, the matter was referred to Magistrate Judge Levin for all discovery motions and supervision, and, subsequently, was reassigned to Magistrate Judge Mason. Since then, Judge Mason has presided over extensive motion practice regarding discovery disputes. Today we deal with a series of objections to Judge Mason's rulings. Specifically, Reed and Freeman (collectively "defendants") object to the magistrate judge's related orders of July 24, 2006, September 14, 2006, and September 18, 2006, and related orders of September 26, 2006, and October 17, 2006.

[1] For a complete factual background, see *American Hardware Manufacturers Association v. Reed Elsevier, Inc.*, 2004 U.S. Dist. LEXIS 28007 (N.D.Ill.2004).

[*4] The first set of objections state defendants' contention that the magistrate judge erred in granting plaintiff's motion to compel Reed to produce documents regarding commissions received in connection with all of Reed's trade shows, granting plaintiff's motion to compel the production of Reed's general financial documentation without limiting the disclosure to Reed Exhibitions, and denying Reed's motion to compel documents reflecting the payments and perks given to family members of counter-defendants William and Timothy Farrell. The second set of objections assert that the magistrate judge again erred in limiting defendants to a combined 15 depositions.

The orders at issue deal with discovery disputes and are non-dispositive. *Phillips v. Raymond Corp., 213 F.R.D. 521, 525 (N.D.Ill.2003)*; *Bobkoski v. Board of Educ. of Cary Consol. School Dist. 26, 141 F.R.D. 88, 90 (N.D.Ill.1992)*. Thus, the standard of review for considering whether to set aside the magistrate judge's orders is governed by *Federal Rule of Civil Procedure 72(a)*, which sets a clearly erroneous standard of review. *Nat'l Educ. Corp. v. Martin, 1994 U.S. Dist. LEXIS 6935, 1994 WL 233661, [*5] *1 (N.D.Ill.1994)*. [2] A more extensive review would frustrate the purpose of referring discovery to a magistrate judge. *See id.* "Clearly erroneous" has been defined as a determination that upon assessing the evidence the reviewing court is "'left with the definite and firm conviction that a mistake has been committed.'" *Bobkoski, 141 F.R.D. at 90-91* (citing *United States v. United States Gypsum, 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948))*. *See also Thornton v. Brown, 47 F.3d 194, 196-97 (7th Cir.1995)* (defining "clearly erroneous" for *Fed.R.Civ.P. 52(a)* analysis, and noting that "[t]he trial court's choice between two permissible views of the evidence cannot be considered clearly erroneous"). [3]

[2] *Fed.R.Civ.P. 72(a)* reads, in pertinent part: "The district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law."

[3] Defendants point to *Holland v. Island Creek*

*Corp., 885 F.Supp.4 (D.D.C.1995)* to argue that "it is incumbent on this Court to review adopted findings against the record 'with particular, even painstaking care' where, as here, the Magistrate did not offer a reasoned explanation for his decision and merely adopted plaintiff's argument." (Reed's brief in support of objection to Magistrate Judge's discovery orders of July 24, 2006, September 14, 2006, and September 18, 2006). While Holland does, in fact, make such a statement, *Holland* was decided in a different district, guided by different circuit court precedent. Defendants have not pointed us, nor have we found in our own search, similar language in the Seventh Circuit. The closest is Judge Shadur's suggestion that "[m]uch as the district judge should defer to the magistrate judge's decisions...he or she should not be hamstrung by the clearly erroneous standard.... [A]lthough an abuse-of-discretion attitude should apply to many discovery and related matters, it need not curtail the power of the district judge to make needed modifications in the magistrate judge's directives." *Phillips, 213 F.R.D. at 525 (N.D.Ill.2003).*

[*6] We begin with defendants' contention that plaintiff should not be entitled to all documents related to Reed and Freeman's nationwide agreement. In his order of July 24, 2006, Judge Mason granted plaintiff's motion to compel defendants to produce all documents (including financial information reflecting any payments/exchanges, "commissions," in-kind benefits or signing bonuses) relating to Reed and Freeman's nationwide agreement(s) and any documents discussing such agreements. Judge Mason found that such documents were reasonably calculated to lead to the discovery of admissible evidence. In the same order Judge Mason denied plaintiff's motion to compel Reed's agreements with other associations or owners affiliated with trade shows, where Freeman paid Reed "commissions" and in-kind benefits, finding plaintiff's arguments insufficient to show that such discovery was reasonably calculated to lead to admissible evidence. In clarifying his order of July 24, 2006, in recognition of the "enormous amount of responsive material Reed and Freeman would have to collect, review and produce," Judge Mason limited plaintiff's discovery to financial information reflecting any payments/exchanges, "commissions, [*7] " in-kind benefits and signing

bonuses, omitting from discovery routine performance communications. He also limited the discovery to the years 1997 and 1998, noting in a footnote that the court would revisit the import of additional discovery if and when AHMA demonstrated its benefit. Defendants ask this court to reverse Judge Mason's order granting plaintiff's motion to compel with respect to defendants' other trade shows, and to quash plaintiff's subpoenas to the other associations involved in such shows.

Reed argues that "[t]he mere fact that Reed and Freeman were parties to nationwide agreements does not entitle plaintiff to documents and information from Reed's other trade shows" (Reed's brief, at 7). Freeman contends that because there is no overlap between the commissions that Freeman paid for the National Hardware Show and the commissions for any other Freeman/Reed show, plaintiff cannot show that discovery of the nationwide agreements is reasonably calculated to lead to admissible evidence. In support, Freeman submitted the declaration of Linda Pilgrim, who was in charge of calculating the commission payments from Freeman to Reed in the years in question. Ms. Pilgrim averred: [*8] "My calculations of the commission payments for the individual Freeman/Reed Shows, including the National Hardware Show ("NHS"), were solely based upon the Exhibitor Billing amounts for that particular show.... As a result, the calculation of the commissions for the NHS is separate from, and entirely unrelated to, anything to do with any of the other Reed/Freeman shows." Plaintiff's response suggests that defendants' are over-simplifying the rationale for plaintiff's request. Plaintiff clarifies that it seeks more than financial information necessary to trace the commissions allocated to Freeman by Reed with regard to the National Hardware Show. Rather, plaintiff desires such discovery to evidence that Reed leveraged the National Hardware Show to entice Freeman into the nationwide agreements. Plaintiff continues, "if AHMA is not permitted full discovery in connection with the Reed/Freeman agreements, AHMA will be left to essentially accept Reed and Freeman's litigation position on the impact and implications of their conduct" (plf's response, at 4-5).

*Rule 26(b)(1)* permits discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending [*9] action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party ...

The information sought need not be admissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." For discovery purposes, relevance is broadly construed. *Behnia v. Shapiro, 176 F.R.D. 277, 280 (N.D.Ill.1997)* (citing *AM Int'l Inc. v. Eastman Kodak Co., 100 F.R.D. 255, 257 (N.D.Ill.1981))*. Defendants have admitted that Freeman paid Reed commissions pursuant to a nationwide agreement (*see, e.g.,* plf's response, exh. B, at P 3). Freeman, in fact, noted that "it paid lawful commissions to Reed in certain years pursuant to a 1998 nationwide contract that based the amount of the lawful commissions on the total of the net exhibitor billings for all of the Reed/Freeman shows, including the National Hardware Show." (*Id.,* at PP 34, 35). Plaintiff has introduced evidence that the Reed/Freeman contracts were negotiated at a national, rather than individual, level (plf's response, exh. D, at 30). Therefore, plaintiff has submitted sufficient evidence to support Judge **[*10]** Mason's ruling that it is entitled to discovery of documents related to the nationwide agreement. *But cf. Cadillac Ins. Co. v. American Nat'l Bank, 1992 U.S. Dist. LEXIS 2815 (N.D.Ill.1992)* (conclusory allegation of commingling accounts was insufficient to persuade the court to broaden the scope of discovery by requiring production of otherwise irrelevant documentation). As the parties do not address the burden of production, and Judge Mason has already undertaken a balancing analysis, we will not disturb his order with respect to exactly what must be produced. In light of this, we also uphold Judge Mason's order regarding the seven subpoenas plaintiff issued to trade associations covered by the Reed/Freeman nationwide agreements.

We turn next to the dispute over the discovery of defendants' financial information. In Judge Mason's order of July 24, 2006, he granted plaintiff's motion to compel financial information relating to the National Hardware Show, Reed Exhibitions and Reed Elsevier, Inc., and Freeman Decorating Company. On September 14, 2006, upon consideration of defendants' motion to reconsider, Judge Mason limited plaintiff's discovery of Reed's financials **[*11]** to "information incorporating Reed Exhibitions" for 1997 and 1998. The magistrate judge again noted that discovery for additional years may be revisited in the future upon plaintiff's demonstration of good cause.

Reed now argues that Judge Mason's order remains unclear and asks this court to amend it to limit plaintiff's

discovery to financial documents that "expressly mention Reed Exhibitions." Reed asserts: "In one sense, all of Reed Elsevier Inc.'s financial documents 'incorporate' Reed Exhibitions, since Reed Exhibitions is merely a division of Reed Elsevier Inc. In addition, most often, Reed's overall financial documents do not break out Reed Exhibitions' information. The information is simply an unidentified and non-segregated component of total numbers on Reed's general financial statements."

We do not find Reed's objections persuasive. Plaintiff's second amended complaint is replete with allegations that Reed concealed the alleged kickbacks, commissions, and bribes from AHMA. (*See* 2d am.cplt., at PP 56, 87, 88, 90, 93, 94, 152). The allegations further note that such payments were concealed in Reed's accounting and financial data. (*See id.,* at PP 89, 95, 103, 154, **[*12]** 156). As Reed admits that Reed Elsevier Inc.'s financial documents account for and incorporate the financials of Reed Exhibitions, it is incumbent on Reed to produce such documents to plaintiff. Judge Mason has already weighed the balance of hardships, and in light of the massive amount of financial information documentation, limited the production to 1997 and 1998. We think such a limitation is sufficient. [4]

> 4   We note that any financial documents that have no reflection of Reed Exhibitions financials are outside the scope of plaintiff's discovery. Therefore, a financial statement of a division of Reed (*e.g.,* LexisNexis) that does not incorporate Reed Exhibitions is not discoverable. But financial documents of Reed Elsevier Inc., incorporating Reed Exhibitions, even if they do not expressly mention Reed Exhibitions, are discoverable.

Freeman also objects to plaintiff's request for the production of Freeman's tax returns and documentation related to the finances of the corporation as a whole. Freeman suggests **[*13]** that plaintiff's request is "purely and simply a fishing expedition," is irrelevant to plaintiff's claims or defendants' counterclaims, and is unduly burdensome. (Freeman's brief, at 8-10). Citing *Fields v. General Motor Corp., 1996 U.S. Dist. LEXIS 206, 1996 WL 14040, *4 (N.D.Ill.1996)*, Freeman argues that a taxpayer should not be compelled to disclose its income tax return information merely because it is a party to a lawsuit (*id.,* at 7). Freeman correctly notes that courts have been reticent to require parties to produce such

documentation unless the litigant puts its income at issue. *Fields, 1996 U.S. Dist. LEXIS 206, 1996 WL 14040 at *4. See also Payne v. Howard, 75 F.R.D. 465, 470 (D.D.C.1977)* (denying motion to compel defendant's tax returns where plaintiff, not defendant, put defendant's income at issue). Courts have looked to *26 U.S.C. §§ 6103 and 7213(a)* to suggest that public policy warns against forcing disclosure of income tax returns, especially where the necessary information can be disclosed through other means. *Id.; Federal Sav. & Loan Ins. Corp. v. Krueger, 55 F.R.D. 512, 514 (N.D.Ill.1972)* (noting [*14] that the policy is "grounded in the interest of the government in full disclosure of all the taxpayer's income which thereby maximizes revenue"). Traditional public policy and privacy concerns, however, are not at the forefront of this dispute. Generally, one party seeks its opponents tax returns to use the opponent's amount of income against him. Where, as here, plaintiff seeks Freeman's tax returns to show how Freeman concealed payments to Reed as deductible business expenses, disclosure of Freeman's tax returns "would not hinder the public policy of full and accurate disclosure of a taxpayer's income." *Houlihan v. Anderson-Stokes, Inc., 78 F.R.D. 232, 234 (D.D.C.1978). See also Shaver v. Yacht Outward Bound, 71 F.R.D. 561 (N.D.Ill.1976)*. Additionally, the parties have entered into a series of protective orders, under which Freeman's tax returns can be disclosed. *See American Air Filter Co., Inc. v. Kannapell, 1990 U.S. Dist. LEXIS 11842, 1990 WL 137385, *4 (D.D.C. 1990)* (noting that privacy concerns were abated where plaintiff offered to sign a confidentiality stipulation whereby defendant's tax returns would not be disclosed to anyone other than counsel).

[*15] Like Judge Mason, we find Freeman's tax returns relevant to plaintiff's claims. For example, plaintiff's second amended complaint asserts, "Freeman's deceptive course of conduct, which included (a) paying undisclosed kickbacks -- disguised as commissions or rebates -- to Reed in return for being hired as general contractor for the Show, ...(c) paying bribes to Reed in exchange for the lucrative general contractor position for the Show, and (d) the concealment, suppression and omission of material facts from AHMA, with the intent that AHMA rely upon the concealment, suppression or omission of such material facts, constitutes deceptive practices under the Consumer Fraud Act and is the type of conduct that the Act was created to remedy." (2<nd> am.cplt., P 104). Also noting the deposition testimony of

Mr. Beaudin, Freeman's 30(b)(6) witness, indicating that (1) Freeman Decorating Services, Inc. does not file a federal tax return, (2) Freeman Decorating Company does file a federal tax return, (3) Freeman Decorating Company's tax return reflects the accounts and performance of Freeman Decorating Services, Inc., and (4) Freeman treated the commissions it received from Reed as tax deductible [*16] business expenses (Beaudin dep, at pp. 71-72), we find that plaintiff is entitled to discover Freeman's tax returns for the relevant years.

Freeman's objection to produce financial documentation related to the company as a whole is also rejected. Freeman's argument centers on the burden it will face in producing such documents, compared to the limited benefit to plaintiff. Judge Mason accounted for such a burden and limited the production to the years 1997 and 1998. We see no reason to disturb his finding. *See American Dental Ass'n Health Foundation v. Bisco, Inc., 1992 U.S. Dist. LEXIS 7226, 1992 WL 107299, *3 (N.D.Ill.1992)* (a magistrate judge's failure to articulate his or her reasoning is, by itself, insufficient to require a remand, especially when there is no evidence that the analysis was conducted in anything but a careful manner).

Next, we turn to defendants' objections to Judge Mason's order denying defendants' motion to compel with respect to (1) documents reflecting AHMA's payments or perks to other Farrell family members, and any entities in which they were shareholders, partners or employees; and (2) documents reflecting the amount of legal fees paid to a law firm at which [*17] William Farrell, Sr.'s son, William Farrell, Jr., was a partner. In Judge Mason's order of July 24, 2006, he denied defendants' requests to obtain discovery from the family members of the individual counter-defendants as irrelevant to the issues presented in the case. Defendants assert that the judge erred in his relevancy determination, arguing that the payments and perks to counter-defendants' families are relevant to defendants' defamation counterclaim, specifically to individual counter-defendants' bad faith motive in filing this suit. Defendants further argue that the payments to William Farrell, Jr.'s law firm are relevant to bias and damages.

Plaintiff argues that defendants' objections are untimely, as they were filed on September 29, 2006, in response to Judge Mason's order of July 24, 2006. The Federal Rules of Civil Procedure require that any

Case: 1:07-cv-04785 Document #: 35 Filed: 03/20/08 Page 33 of 59 PageID #:133

Page 6
2007 U.S. Dist. LEXIS 39639, *17

objections to a magistrate judge's order be filed within ten days of the order (*Rule 72(a)*). We are, however, persuaded that where, as here, the magistrate judge was considering a motion to clarify or reconsider, the ten days should not begin to run until the magistrate judge comes to a final conclusion. *See Epperly v. Lehmann Co., 161 F.R.D. 72, 74 (S.D.Ind.1994)* [*18] (relying on *Comeau v. Rupp, 142 F.R.D. 683, 685-86 (D.Kan.1992)*). Therefore, defendants would be granted ten days from the date of Judge Mason's order on reconsideration, filed September 14, 2006. Defendants argue that they properly excluded weekends and the date of ruling to arrive at the September 29, 2004 objection filing date. Defendants incorrectly note that Judge Mason filed his reconsideration order on September 15, 2006. Rather, he filed the order on September 14, 2006. Discounting weekends, defendants' objections were due September 28, 2004.

Because the magistrate judge's order was mailed to the parties, however, *Rule 6(e)* adds three mailing days onto the length of time necessary to object. Not counting weekends and holidays, that would allow defendants until October 3, 2006, to object. Counting holidays and weekends, defendants' objections would be timely on or before September 27, 2006. There is a debate over whether the ten-day rule includes weekends and holidays where, as here, the magistrate judge mailed his order to counsel of record. The issue involves an analysis of the interplay between *Rules 72(a), 6(a)*, and *6(e)*. In *THK America, Inc. v. NSK Ltd., 157 F.R.D. 651 (N.D.Ill.1994)*, [*19] Judge Norgle held that where the magistrate judge mailed his order to counsel, the application of *Rule 6(e)* extended the time to file objections to 13 days. This, Judge Norgle noted, took the defendants' objections out of *Rule 6(a)*, and therefore the 13-day time period included holidays and weekends. Other courts disagree, and commence the ten-day period at the end of the three-day mailing period. *See Epperly, 161 F.R.D. at 75-76*. While both sides have persuasive arguments, because Judge Mason's order did not clearly state the filing deadlines for objections (*but cf. THK America, Inc., 157 F.R.D. at 654*), we will proceed to address the merits of defendants' objections.

Defendants contend that counter-defendants put the disputed discovery at issue in asserting the affirmative defense of business judgment rule and right of fair comment on a matter of public interest to defendants' defamation counterclaim. Defendants assert that they are "entitled to defeat these affirmative defenses by demonstrating that AHMA and its officers, the Farrells, abused the privilege through bad faith and improper motivation" (Reed's brief, at 11). Specifically, defendants [*20] contend that they are entitled to discovery to prove "that AHMA's motivation in filing the lawsuit was to defame Reed in order to protect the Farrell family's receipt of payments and perks" (Reed's brief, at 11).

In Illinois, a party defending against a defamation suit may be entitled to a qualified or conditional privilege. In *Kuwik v. Starmark Star Marketing and Administration, Inc., 156 Ill. 2d 16, 619 N.E.2d 129, 188 Ill. Dec. 765 (Ill.1993)*, the Illinois Supreme Court rejected the previously used two-part test for conditional privilege, whereby (1) the judge determined, as a matter of law, whether defendant acted in good faith by applying a five-part test (including a determination of good faith) to determine whether the privilege applied, and then (2) the fact-finder determined whether the defendant acted with malice to defeat the privilege. Instead, the Kuwik court held that the judge should determine whether the occasion was conditionally privileged and then the fact-finder should determine whether the defendant abused such a privilege. *Id.* For our practical purposes, the change means that the *Kuwik* court took the good faith determination out of the initial determination and wrapped [*21] it into the jury's determination of abuse of privilege. The Kuwik court explained, "to prove an abuse of the qualified privilege, the plaintiff must show 'a direct intention to injure another, or *** a reckless disregard of [the defamed party's] rights and of the consequences that may result to him.'" *Id., at 135-36* (quoting *Bratt v. Int'l Business Machines Corp., 392 Mass. 508, 467 N.E.2d 126, 131 (Mass.1961)*). The Illinois Supreme Court continued: "Thus, an abuse of a qualified privilege may consist of any reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth of the matter, limit the scope of the material, or send the material to only the proper parties." *Id.*

Essentially, defendants argue that (1) counter-defendants defamed Reed by filing this lawsuit; (2) the suit was filed in bad faith and with improper motivation to protect counter-defendants' and their families' perks and payments associated with the hardware show; (3) the bad faith defeats counter-defendants' affirmative defenses of qualified or conditional privileges; and (4) thus the amount of the

perks and payment (the self-enrichment) [*22] is relevant to defendants' counterclaims or at least likely to lead to admissible evidence. Specifically, Reed asserts, "[t]he lengths to which AHMA and its officers would go to protect the Farrell family fortune can only be explored by determining through discovery how much AHMA paid to all family members -- whether it was in salary, gifts, perks, cars, or legal fees paid to the firm in which William Farrell, Jr. was a partner. The higher the amount AHMA stood to lose if its 2004 show failed and Reed's 2004 National Hardware Show succeeded, the more likely it is that this litigation was filed only to allow AHMA to defame Reed and attempt to hide behind the veil of various conditional privileges to defamation" (Reed's brief, at 13).

Under *Kuwik*, "it is the province of the trier of fact to determine whether the qualified privilege has been abused by examining the facts of a particular case, including whether the defendant acted in good faith." *Girsberger v. Kresz, 261 Ill. App. 3d 398, 633 N.E.2d 781, 794, 198 Ill. Dec. 940 (Ill.App.Ct.1993)*. As we noted above, *Rule 26* permits comprehensive discovery, and relevance is construed broadly. It is our view that it is possible that discovery of the payments [*23] and perks to the Farrell family members could lead to admissible evidence helpful to a jury in determining whether counter-defendants abused their conditional privilege as to Reed's defamation claims. Therefore, we reverse Judge Mason's denial of defendants' motion to compel.

Finally, we turn to defendants' motions objecting to Judge Mason's order restricting their depositions. The procedural history of this motion is complicated and very well briefed. After an inability to agree on the number of depositions due each side, plaintiff (AHMA) and counter-defendants (Farrells) moved to collectively take 30 depositions. Without response from Reed, Judge Mason determined that the number of depositions taken in the case should be limited to 45. Confusion regarding the allocation of the 45 depositions ensued, and Reed and Freeman moved for clarification. [5] Judge Mason, in an order dated September 26, 2006, clarified: AHMA was entitled to 15 depositions, Farrells to 15 depositions, and Reed and Freeman, collectively, to 15 depositions. On October 12, 2006, Reed and Freeman filed two motions, one before this court and the other before the magistrate judge. The motion before this court was [*24] an objection to Judge Mason's September 26, 2006, order. The motion before Judge Mason was an affirmative

request from Reed and Freeman to increase the number of their depositions to 30. On October 17, 2006, Judge Mason denied Reed and Freeman's request for additional depositions, but noted: "Nevertheless, if, after taking fifteen depositions allotted, Reed and Freeman demonstrate that good cause exists to exceed fifteen depositions, we will revisit the issue." In the meantime, the parties briefed Reed and Freeman's objections to Judge Mason's September 26, 2006, order. Before we had an opportunity to take a look at those briefings, Reed and Freeman filed their objections to Judge Mason's October 17, 2006, order, to be consolidated with their objections filed to his September 26, 2006, order. An opposition brief filed by AHMA and Farrells arrived on November 11, 2006, and the issues became ripe for determination.

5   Reed and Freeman believed Judge Mason awarded them, collectively, 25 depositions, and AHMA and Farrells, collectively, 20 depositions. AHMA and Farrells understood Judge Mason's order to grant AHMA 15 depositions, Farrells 15 depositions, and Reed and Freeman, collectively, 15 depositions.

[*25] A lot of paperwork boils down to a small number of arguments from Reed and Freeman that Judge Mason's decision to restrict their depositions to 15 was clearly erroneous. None is persuasive. First, defendants argue that because Judge Mason did not wait for a response to AHMA and Farrells' request for 30 depositions before he ruled, the September 26, 2006, order was clearly erroneous. We disagree. *Rule 26(b)(2)* allows the court to alter the number of depositions (ten) guaranteed under *Rule 30(a)(2)(A)*. The Advisory Committee notes from 1983 state, "The court may act on motion, or its own initiative." Furthermore, Reed and Freeman subsequently filed an affirmative request for 30 depositions, which was considered and rejected by Judge Mason. Their arguments have been given their fair due.

Second, defendants argue that the allocation of depositions is unfair. Their inequity argument, in addition to asserting a general sense of unfairness, indicates that because their interests are not as aligned as AHMA and Farrells' are, they should be entitled to at least as many depositions. We do not find Judge Mason's ruling clearly erroneous. The 1983 Advisory Committee notes regarding *Rule 26(b)(2)* [*26] state: "The new sentence is intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse.... But the

court must be careful not to deprive a party of discovery that is reasonably necessary to afford a fair opportunity to develop and prepare the case." We think Judge Mason conformed to both sentences, without error. He limited the parties' depositions to fifteen each, [6] and allowed Reed and Freeman the opportunity to revisit the issue in the future upon a showing of good cause. No more is necessary. Further, Reed and Freeman have generally presented a united front in approaching their defense. Therefore, although they may be separate entities, their interests are generally aligned.

> 6 *Rule 30(a)(2)(A)* defines the deposing parties to be (1) plaintiffs, (2) defendants, and (3) third party defendants. Here, AHMA is the plaintiff, Reed and Freeman are the defendants, and Farrells are the third party defendants. Judge Mason granted each party 15 depositions, and specified that AHMA and the Farrells could not share their allocation. Defendants assert that Judge Mason's conformance with the Federal Rules of Civil Procedure elevates form over substance. We disagree.

[*27] Third, defendants contend that the extent and complexity of the case requires extra depositions. We must weigh the benefit to defendants of additional discovery against the cost and burden to all of the parties of participating in such discovery. Judge Mason is well

aware of the issues and claims in this case, as well as the resources and requests of each party. He is in the best position to weigh the benefits against the burdens, and we see no reason to reverse his determination. Therefore, we deny defendants' objections to the magistrate judge's order restricting their depositions to 15. Each party should pay its own costs associated with this motion.

CONCLUSION

For the reasons stated herein, we affirm the magistrate judge's orders with respect to plaintiff's motion to compel Reed to produce documents regarding commissions received in connection with all of Reed's trade shows, plaintiff's motion to compel the production of Reed's general financial documentation, without limiting the disclosure to Reed Exhibitions, and defendants' motion for leave to take 30 depositions. We reverse the magistrate judge's orders with respect to Reed's motion to compel documents reflecting AHMA's [*28] payments and perks given to family members of counter-defendants William Farrell, Sr. and Timothy Farrell.

JAMES B. MORAN

Senior Judge, U. S. District Court

Feb. 13, 2007.

# Exhibit D

## Tarnow, William J.

| | |
|---|---|
| **From:** | Tarnow, William J. |
| **Sent:** | Thursday, January 10, 2008 2:05 AM |
| **To:** | 'Risa Morris' |
| **Cc:** | 'Jennifer Romano' |
| **Subject:** | RE: LECG/Salomon Discovery |

Risa:

I hope this email finds you well too.

I absolutely disagree with your assertion that I did not provide a reason to search prior to January 1, 2007 for Mssrs. Colton, Anastasi and Elson.  I specifically discussed during our last call that, among other things, any discussions/communications regarding what Mr. Salomon's duties/etc. WERE are inherently relevant to what they BECAME, for purposes of the "Good Reason" termination analysis.  This reason alone would require expandind the search to before January 1, 2007.  Thus, I must reiterate our position that the January 1, 2007 computer-search "start date" for these custodians be eliminated.

You have not yet responded as to the end date of the search (for which I was waiting to reply in full), so let me reiterate our position that there should not be an end date.  As with the start-date, our agreed upon initial keyword search criteria, in and of itself, narrows the search results.  Imposing overly restrictive date parameters is not acceptable.

I believe that you have identified signifcant  errors in your document production on at least 4 different occasions.  Please immediately advise as to (1) which custodians' documents you have actually produced so far -- and when the others will be produced, (2) which bates-ranges you intended to produce were not actually produced and/or were not accessible, and (3) which documents you wish for us to return as being inadvertently disclosed.  Please also advise as to when you will be producing the remaining documents we have requested.

At this point, we still need to get the proposed order to Judge Pallmeyer.  However, if it turns out there will be additional and significant delay in the full production, we may need to revisit the issue with the court before submitting any proposed order.  Accordingly, I ask that you please provide the summary of the status of the document production ASAP.

Thank you.

Bill

William J. Tarnow
Neal, Gerber & Eisenberg LLP
2 N. LaSalle Street, Suite 2200
Chicago, IL 60602
(312) 269-8489
(312) 429-3573 (fax)
wtarnow@ngelaw.com
www.ngelaw.com

CONFIDENTIAL NOTE

THIS E-MAIL TRANSMISSION AND ANY ATTACHMENTS HERETO CONTAIN INFORMATION FROM THE LAW FIRM OF NEAL, GERBER & EISENBERG WHICH IS CONFIDENTIAL AND PRIVILEGED.  THE INFORMATION IS

# Exhibit E

## Tarnow, William J.

| | |
|---|---|
| **From:** | Tarnow, William J. |
| **Sent:** | Monday, January 28, 2008 5:35 PM |
| **To:** | 'Risa Morris' |
| **Cc:** | Jennifer Romano; marvin@tenenbaumlaw.com |
| **Subject:** | RE: Salomon/LECG Discovery -- Mssrs. Colton, Elson, andAnastasi |

Risa:

Thank you for your response, but I must continue to disagree regarding the date restrictions. The interaction of these individuals relative to Mr. Salomon's job duties and responsibilities -- as well as LECG assignment of duties in a manner inconsistent with Mr. Salomon's contract and supposed duties thereunder -- are relevant insomuch as they bear on what Mr. Salomon was assigned to do (or later was not assigned to do) under his employment contract, and how those changing duties were re-assigned within LECG. The shifting duties may have culminated in 2007, but very well could have begun before that time. For these three individuals in particular, any discussions, assignments of duties and responsibilities, etc. would all bear directly on Mr. Salomon's claims. The are not only relevant themselves -- but might have information leading to relevant information (which, of course, is the standard) -- and should be included in the full search. Some examples are illustrative:

Mr. Colton would have information as to Mr. Salomon's prior role, titles, responsibilities and duties. He also prepares drafts of new/proposed contracts and is involved with setting various financial terms.

Mr. Elson, as office manager, may very well have been involved in communications regarding Mr. Salomon's duties and responsibilities as a member of that office. I disagree that it could only be "tangential" at best; instead, it could bear directly on Mr. Salomon's claims. Further, Mr. Elson also served on both the executive management committee and the executive management team. He was designated by LECG as the point person for inquiries and very well could have been involved in communications regarding Mr. Salomon (and/or regarding the duties/roles of others, as would bear on Mr. Salomon's position) and his role within the company.

Mr. Anastasi has been involved as representing himself as the Head of the Practice, and he had significant and on-going conversations with management as to the direction and thrust of the practice throughout Mr. Salomon's time at LECG. His communications concerning the practice -- and thus Mr. Salomon's position therein -- are certainly relevant.

In short, it remains our position that there would be no reason to exclude from the production those emails which may have been exchanged in December, 2006, for example, while going on to produce those which were exchanged after January 1, 2007. We must maintain that the search criteria -- which are already designed to significantly limit the search parameters -- be applied prior to January 1, 2007 for these three individuals (i.e. Mssrs. Colton, Elson, and Anastassi).

I look forward to speaking with you tomorrow.

Regards,

Bill


William J. Tarnow
Neal, Gerber & Eisenberg LLP
2 N. LaSalle Street, Suite 2200
Chicago, IL 60602
(312) 269-8489

# Exhibit F

## Tarnow, William J.

| | |
|---|---|
| **From:** | Tarnow, William J. |
| **Sent:** | Sunday, January 27, 2008 12:07 PM |
| **To:** | 'Risa Morris' |
| **Subject:** | Salomon/LECG Discovery -- Mssrs. Colton, Elson, and Anastasi |

Risa:

In advance of our upcoming call, I want to respond further to your email of January 10. (I had thought that I send you the substance of the following email earlier, but don't now see it). You inquired as to potential relevance of searching Mssrs. Colton, Elson and Anastassi prior to January 1, 2007. I thought I had responded specifically on that issue, but don't see that communication (at least in my emails). This email reiterates our position that each of these custodians must be searched for the full period dating back to Mr. Salomon's (or, as appropriate, their own subsequent) affiliation with LECG. Below is a brief summary (which is all that is needed in light of applicable Rules) of each custodian's relevance:

With respect to Mr. Colton, he and Mr. Salomon worked worked extensively on acquisitions on behalf of the firm since 2005. He also was the contact point for financial projections for modification to Mr. Salomon's contract. He very well may have critical information relative to Mr. Salomon's various roles, duties, titles, and responsibilities in the firm, as well as related compensation issues.

Mr. Elson is the office manager for Chicago. Mr. Salomon had been located at the Chicago office since December, 2005. He could possess various documents and communications related to Mr. Salomon's duties and responsibilities, including but not limited to how they changed over time.

Mr. Anastasi has held himself out as the global head of the Forensic Analytics practice -- i.e the forensic accounting practice. The relevance/need for these emails is self-evident, it would seem.

Regards,

Bill

# Exhibit G

NEAL ▪ GERBER ▪ EISENBERG

William J. Tarnow
Attorney at Law

Tel 312.269.8489
Fax 312.269.1747
wtarnow@ngelaw.com

February 14, 2008

**VIA FACSIMILE AND EMAIL**

Risa J. Morris, Esq.
Folger Levin & Kahn LLP
1900 Avenue of the Stars, 28th Floor
Los Angeles, CA 90067

Re: ***Salomon v. LECG, LLC***

Dear Risa:

This letter serves respond to your letter of February 7, 2008, which you sent me following our telephone call of January 29, 2008. For purposes of clarity, I have re-stated the full text of your letters verbatim below, followed by my response to each – in **bold**.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff's Receipt of LECG's Production of Burke Documents

You claimed that you have not received the CD produced by LECG containing documents of Jack Burke. We discussed that your office had accepted receipt of the CD on January 14, 2008. Please confirm that the CD has been located, as I will need to notify my client if these sensitive documents have been lost.

**RESPONSE: It seems that the CD has arrived.**

Notice of Deposition of Plaintiff

This will confirm that I requested information regarding Plaintiffs availability for his deposition, which was noticed on November 5, 2007, and initially set for December 13, 2007. You refused to provide the requested information pending receipt of all documents being produced by Defendant. As I stated in our call, Plaintiff has no basis to refuse to be deposed pending receipt of documents, particularly given that Defendant has already produced thousands of documents to Plaintiff. In this regard, I direct your attention to Judge Pallmeyer's standing Case Management Procedures, which specifically provide that there is "no `order' in which discovery must occur." Please immediately provide dates on which Mr. Salomon is available for his deposition.

**RESPONSE: We maintain that Mr. Salomon's deposition should not occur until after we have received the documents that have been outstanding for months now. As**

---

Neal, Gerber & Eisenberg LLP ▪ Two North LaSalle Street ▪ Chicago, Illinois 60602-3801 ▪ 312.269.8000 ▪ www.ngelaw.com

NEAL, GERBER & EISENBERG LLP

Risa J. Morris, Esq.
February 14, 2008
Page 2

discussed, we were forced to file a Motion requesting an extension of discovery dates because of the on-going delay in LECG's production of documents responsive to the Document Requests we served in October – well in advance of the Notice of Deposition you later served for Mr. Salomon's deposition. The Court granted our Motion, over your objection. It is now nearly 1 ½ months after the Court extended the discovery dates, and it seems that we have received only a fraction of the documents that we should expect to receive. Your document production has proceeded woefully slower than was even represented in court. Furthermore, you have explained that only <u>after</u> all of LECG's documents are produced, over the course of the next month or more (at a minimum) will you begin compiling a privilege log – which you acknowledged in our last call is going to be extremely lengthy and will take many more weeks/months to produce. It is wholly premature to suggest that Mr. Salomon must be deposed before he receives the documents responsive to his discovery requests – which, I note, were served well <u>before</u> your issuance of the referenced deposition notice.

<u>Plaintiff Responses to Defendants First Set of Written Discovery</u>

To date, you have not responded to my letter dated December 19, 2007, which outlined various deficiencies in Plaintiff's responses to Defendant's First Set of Requests for Production and First Set of Interrogatories. In our call, you stated that you would review the letter and advise whether Plaintiff will provide supplemental responses. Please do so immediately.

**<u>RESPONSE</u>: To be clear, I have not responded to your letter in *writing*. That is because we agreed to cover any points you wished to cover during our telephone call. And then you and I did just that on January 29th. During that call, I asked which issues from your January 29 letter you wished to discuss specifically. We then discussed a few discreet points – including production of pre-LECG-separation correspondence; I explained that I would separately look at whether we would agree to possibly expand our position in response to the points you had raised. On this issue, I can confirm that we <u>have</u> agreed to produce Mr. Salomon's communications pre-LECG-termination. Those documents have been transmitted to you already.**

<u>Plaintiff's Responses to Defendant's Second Set of Written Discovery</u>

As detailed in my letter of January 23, 2008, Plaintiff has failed to provide any substantive responses to Defendant's Second Set of Requests for Production and Second Set of Interrogatories. In our call, you stated that you would speak to your client regarding providing supplemental responses and producing responsive documents dated prior to the termination of his employment with LECG. Please confirm that you will provide those supplemental responses and documents. However, as I noted in our call, LECG remains entitled to production of all responsive documents, as well as substantive responses to all of the written discovery, without limitation to the time period prior to Plaintiff's resignation.

NEAL, GERBER & EISENBERG LLP

Risa J. Morris, Esq.
February 14, 2008
Page 3

**RESPONSE**: As set forth in the preceding Response, we have agreed to produce communications through Mr. Salomon's last day of employment with LECG. Per our objections, and as discussed in our call, any documents that *post*-date his separation from LECG are not in any way related to the issues set forth in the Complaint. Namely, the nature of Mr. Salomon's duties in his new position with another company – whether as a forensic analyst or as a janitor – has no bearing on whether he had "Good Reason" to leave LECG at the time he did, under the express terms of his LECG agreement.

Email Production by Plaintiff

This will confirm that you agreed to produce the documents delivered to Defendant on January 14, 2008, described in my letter dated January 16, 2008, in a useable format. Please do so as soon as possible.

**RESPONSE**: Your summary here is inaccurate. I explained that I would produce them in electronic format if they existed in that format. However, I have investigated the issue and it seems that they do <u>not</u> exist in another format. We have delivered the documents in the same format as they were maintained by Mr. Salomon, and thus you have documents in a form identical to those possessed by Mr. Salomon.

Production of Electronic Records for Messrs. Colton, Anastasi and Elson

Because Mr. Colton may have been involved in the negotiation or drafting of the First Amendment to Plaintiff's Director Agreement beginning in February 2006, Defendant will now agree to produce responsive documents for Mr. Colton dated beginning February 1, 2006.

**RESPONSE**: We appreciate your agreement to move the "start date" for the search of Mr. Colton's documents to February 1, 2006. Please continue your search of those documents.

However, we also maintain that the search should go back further, as we always have requested. Mr. Colton interacted with Mr. Salomon on a regular basis throughout Mr. Salomon's employment with LECG. In addition, Mr. Colton – including in his capacity of Director of Finance with LECG – prepared numerous analyses for senior management and very well could have prepared documents or maintained/received records relating to Mr. Salomon, including as bore on his duties, responsibilities and role within LECG. Pursuant to the applicable FRCP Rule 26 standards, there is no basis for curtailing the search of Mr. Colton's documents by imposing a February 1, 2006 parameter.

This will further confirm that Plaintiff has not provided Defendant with a sufficient basis to produce further documents for Messrs. Elson and Anastasi, such that at this time the review will be limited to the period from January 1, 2007 forward. However, as I noted in my call,

NEAL, GERBER & EISENBERG LLP

Risa J. Morris, Esq.
February 14, 2008
Page 4

please let me know if you identify any information supporting further review and production of documents for these custodians.

     **RESPONSE:**   **Time and again I have described precisely how Messrs. Elson and Anastasi are relevant (or, more accurately, why they reasonably could be expected to have material *leading* to relevant information, as is the applicable Rule 26 standard, of course). And in response to each description I have provided, you have merely asserted that I have not provided a "sufficient basis" and have then suggested that I could try to further provide "any information" I wished for you to consider.   Notably, you have never once re-stated or otherwise acknowledged in your letters the information I <u>have</u> provided, or attempted to define <u>why</u> it was not "sufficient." Without attempting to re-state herein all of the reasons I have <u>already</u> provided you relative to Messrs. Elson and Anastasi, I will briefly summarize their relevance (again) as follows:**

     ►   **<u>Mr. Anastasi</u> – throughout the period of Mr. Salomon's employment at LECG Mr. Anastasi held *himself* out as the Leader of the Forensic Analysis practice at LECG, whereas Mr. Salomon was to lead the National Forensic Accounting Practice. As such, communications involving and other documentation concerning or maintained by Mr. Anastasi are unquestionably relevant. As you are well aware, the very heart of the case concerns whether Mr. Salomon had "Good Reason" to terminate his employment due to a change in his role with LECG. I don't see how you could object in good faith to the further search of Mr. Anastasi's files. If you have a basis for explaining why his documents may not even potentially be relevant, please provide it. To this point, you have not provided any legitimate basis for failing to review his files – under the narrow search-term parameters upon which the parties expressly negotiated and agreed.**

     ►   **<u>Mr. Elson</u> – Mr. Elson was (and I believe still is) the office director for Chicago's LECG office, where Mr. Salomon worked from December 200<u>5</u> through the last day of his LECG employment. As the office director, Mr. Elson maintained overall responsibility for all matters in Chicago. There can be little doubt that he falls squarely within the scope of Rule 26 – meaning that he may possess documents which are either relevant themselves or which lead to relevant information. Once again, I must underscore that we have reached *agreement* upon the narrow list of search terms – it is now just a matter of running those terms through Mr. Elson's computer files.**

<u>Additional Custodians</u>

     In our call, I stated that I would provide further information regarding our position on production of documents for Messrs. Westerman, Mack and Kennedy. With respect to Messrs. Mack and Kennedy, my letter dated December 19, 2007 summarizes Defendant's position with respect to production of documents for these custodians. I have enclosed a copy of this letter for

NEAL, GERBER & EISENBERG LLP

Risa J. Morris, Esq.
February 14, 2008
Page 5

your reference. My records reflect that we have not received a response to the points raised in that letter on this issue.

**RESPONSE**: **Mr. Mack and Mr. Kennedy would have documents relating to the performance of the Mack Barclay acquisition. As I have explained already, that acquisition is important in determining the compensation due Mr. Salomon pursuant to the bonus portion of his employment agreement. Thus, these individuals have information relative to substantial wages due and owing to Mr. Salomon – the issue at the very heart of this case.**

With respect to Mr. Westerman, I had indicated in my letter dated December 19, 2007, that I would investigate Plaintiff's claims with respect to his role and provide a further response at a later date. I am currently investigating this issue and will advise you of the outcome of my inquiries.

**RESPONSE: It has been <u>three</u> <u>months</u> since we proposed Mr. Westerman as a custodian whose records should be searched. As you acknowledge yourself it has been <u>two</u> <u>months</u> – i.e. since your letter dated December 19th – that you have been "investigating" whether Mr. Westerman might be relevant. He <u>is</u> relevant under Rule 26, and we insist that his records (in all forms – as with all custodians of course) be searched.**

### ADDITIONAL POINTS:

**Custodians / Hard-Copy Documents – As we are covering the issues of search parameters, please confirm for me that – in addition to the computer files – LECG is also producing all *hard-copy documents* responsive to the discovery requests, including *but not limited to* those documents maintained by the custodians I have requested be searched on the computer system. In other words, we insist that hardcopy documents responsive to the Requests be produced, even if maintained by someone other than whose computer is being searched. We had agreed on initial search terms/custodians (with our express reservation of rights relative thereto) as a way of limiting the expense/time required on your end for searching the computers. No such comparable expense is associated with asking employees to produce any hardcopy documents that might have in their personal files. If you are *not* producing all hardcopy documents maintained within LECG responsive to our document requests, please specifically identify your basis for refusing to do so, together with citation to applicable authority permitting you to limit your search to merely the computer system. Here is but one example – which is merely representative and is not intended to be limiting in any way – as to how hardcopy documents would be relevant: if the Compensation Committee (or its members, respectively) maintained notes or minutes (whether personally or officially, in draft or final form) relating to Mr. Salomon and discussion of wages payable to him, those documents must be produced. As another (non-limiting) example, all mark-ups of proposed contracts/amendments with Mr. Salomon – as well as anyone's personal notes or edits regarding the documents – would be central to the issues in this**

NEAL, GERBER & EISENBERG LLP

Risa J. Morris, Esq.
February 14, 2008
Page 6

case, and thus must be produced. Such hardcopy documents –whoever might possess them (whether on the custodian computer-search list or not) and/or wherever they might reside – would be critical to the central issues in this case. Thus, in the interest of being crystal clear, we reiterate our position that all responsive documents (drafts, final copies, etc.) in hardcopy form be produced, regardless of who created or maintained them and/or where they presently reside. Please confirm that the document production from LECG is proceeding accordingly.

Back Up Tapes / Metadata – Please immediately confirm that LECG's computer document search encompasses all back-up tapes and other document storage media/formats – and specifically includes production of all metadata. In addition to be required under the FRCP, those instructions were specifically included in our Document Request definitions. (See Requests for Production, Definition No. 1 – defining relevant "Documents" to include, inter alia, "tapes; computer storage media; recording tapes, including back-up tapes of computer files, e-mail, and voicemail .... disks ... emails e-mails, text messages, or instant messages contained in any computer or information retrieval device [including but not limited to] ... computer or electronic records of any type created maintained, stored or utilized on any computer system or network, servers and other electronic storage devices, back-up tapes or individuals' hard-drives including, but not limited to, electronic or paper versions of email messages and attachments or other type of electronically stored information or other data compilation"). I trust you have proceeded accordingly (as is required under the FRCP in any event), but would appreciate your prompt and direct confirmation of this point.

# Exhibit H

**INTERROGATORY NO. 3:**

For each monthly "Final Settlement" or "Expert True Up" report provided (and to be provided) to Mr. Salomon since June 2, 2004 (including, for example, as tendered from LECG counsel's to Mr. Salomon's counsel by way of email dated February 7, 2008 at 6:00 PM CST), identify (i) all person(s) responsible for the production and accuracy of such report(s), (ii) all persons who prepared and/or contribute(d) data to - and/or otherwise participated in - the compilation or preparation of said reports, (iii) the persons responsible for responding to inquiries about the data supporting and/or accuracy of such reports, (iv) the custodian(s) of the records used in the preparation of said reports, (v) a description of the systems - and records generated by the systems - used in the preparation of said reports, and (vi) a description of the location and the format of the underlying data used in the preparation of said reports.

## RESPONSE TO INTERROGATORY NO. 3(i):

Defendant objects to this Interrogatory on the ground that it is overbroad as to time to the extent it seeks information regarding dated prior to Plaintiff's resignation from employment with Defendant. Defendant further objects to this Interrogatory on the ground that it is vague and ambiguous in its reference to "each monthly "Final Settlement" or "Expert True Up" report provided (and to be provided) to Mr. Salomon since June 2, 2004" as the referenced reports have been provided to Plaintiff only since his resignation. Notwithstanding the foregoing objections and without prejudice thereto, Defendant responds: Defendant's Accounting Department, which falls under the supervision of Defendant's Corporate Controller, is responsible for generating the referenced reports.

## RESPONSE TO INTERROGATORY NO. 3(ii):

Defendant objects to this Interrogatory on the ground that it is overbroad as to time to the extent it seeks information regarding the referenced reports prior to Plaintiff's resignation from employment with Defendant. Defendant further objects to this Interrogatory on the ground that it is vague and ambiguous in its reference to "each monthly "Final Settlement" or "Expert True Up" report provided (and to be provided) to Mr. Salomon since June 2, 2004" as the referenced reports have been provided to Plaintiff only since his resignation. Notwithstanding the foregoing objections and without prejudice thereto, Defendant responds: Defendant's Accounting Department is responsible for preparing the reports. Staff members within the Accounting Department with responsibilities relating to general accounting, expert accounting, payroll, and project accounting/collections all contribute to the reports.

**RESPONSE TO INTERROGATORY NO. 3(iii):**

Defendant objects to this Interrogatory on the ground that it is overbroad as to time to the extent it seeks information regarding the referenced reports prior to Plaintiff's resignation from employment with Defendant. Defendant further objects to this Interrogatory on the ground that it is vague and ambiguous in its reference to "each monthly "Final Settlement" or "Expert True Up" report provided (and to be provided) to Mr. Salomon since June 2, 2004" as the referenced reports have been provided to Plaintiff only since his resignation. Notwithstanding the foregoing objections and without prejudice thereto, Defendant responds: Defendant's Accounting Department, which falls under the supervision of Defendant's Corporate Controller, is responsible for generating the referenced reports.

**RESPONSE TO INTERROGATORY NO. 3(iv):**

Defendant objects to this Interrogatory on the ground that it is overbroad as to time to the extent it seeks information regarding the referenced reports prior to Plaintiff's resignation from employment with Defendant. Defendant further objects to this Interrogatory on the ground that it is vague and ambiguous in its reference to "each monthly "Final Settlement" or "Expert True Up" report provided (and to be provided) to Mr. Salomon since June 2, 2004" as the referenced reports have been provided to Plaintiff only since his resignation. Notwithstanding the foregoing objections and without prejudice thereto, Defendant responds: Defendant's Accounting Department has custody of records used to prepare the reports. Additional records are stored in Defendant's accounting systems, described in response to Interrogatory No. 3(v) below.

**RESPONSE TO INTERROGATORY NO. 3(v):**

Defendant objects to this Interrogatory on the ground that it is overbroad as to time to the extent it seeks information regarding the referenced reports prior to Plaintiff's resignation from

employment with Defendant. Defendant further objects to this Interrogatory on the ground that it is vague and ambiguous in its reference to "each monthly "Final Settlement" or "Expert True Up" report provided (and to be provided) to Mr. Salomon since June 2, 2004" as the referenced reports have been provided to Plaintiff only since his resignation. Defendant further objects to this Interrogatory on the ground that it is vague and ambiguous with respect to the terms "systems" and "records generated by the systems". Notwithstanding the foregoing objections and without prejudice thereto, Defendant responds: The reports are generated in part by accessing a system called Elite. Elite accesses records relating to hours billed, receivables and other data which are analyzed by Elite's software to generate the spreadsheets. The reports are also generated in part by accessing a system called Expert Accounting System ("EAS"), which generates information related to expert compensation. Both systems generate records upon queries from users.

## RESPONSE TO INTERROGATORY NO. 3(vi):

Defendant objects to this Interrogatory on the ground that it is overbroad as to time to the extent it seeks information regarding the referenced reports prior to Plaintiff's resignation from employment with Defendant. Defendant further objects to this Interrogatory on the ground that it is vague and ambiguous in its reference to "each monthly "Final Settlement" or "Expert True Up" report provided (and to be provided) to Mr. Salomon since June 2, 2004" as the referenced reports have been provided to Plaintiff only since his resignation. Defendant further objects to this Interrogatory on the ground that it is vague and ambiguous with respect to the term "format of the underlying data". Notwithstanding the foregoing objection and without prejudice thereto, Defendant responds: The underlying data used to generate the referenced reports is stored

electronically and thus has no geographical location. It is formatted by Elite, EAS, Excel and Microsoft Word.

# Exhibit I

Site M

LECG

Experts    Practice Areas    International    Offices    Careers    Investor Relations    About LECG    Contact Us

Electronic Discovery Home
Overview
Partners & Affiliations
Expert Qualifications
Experts

## practice area: electronic discovery

**LECG Electronic Discovery Experts Keep Pace with Regulatory and Technology Issues**
Electronic discovery is no longer something that businesses can ignore and lawyers can deal with only in smoking-gun e-mails. Electronic discovery is now a critical component in regulatory compliance, litigation, and corporate investigations. The need to keep pace with challenging regulatory and technology issues fuels the demand for electronic discovery services.

LECG electronic discovery experts work directly with outside counsel, general counsel, corporate executives, bank examiners, bankruptcy trustees, forensic accountants, fraud examiners, and damages experts to deliver objective advice in all phases of the electronic discovery process. We provide global expert and professional crisis preparedness, investigation and response services. We accomplish this by providing an objective assessment of data risk throughout its life cycle associated with litigation, regulatory, market, economic, and operational conditions.

LECG electronic discovery experts are nationally and internationally recognized strategic advisors and testifying experts. By handling electronic discovery complexities clients focus on the merits of their case.

**Areas of Expertise**

- Expert testimony on industry best practices, methods and processes
- Experience with the SEC, DOJ and other regulatory bodies in the US and the UK
- Compliance with European Data Privacy and Data Safe Harbor
- Compliance with US and UK discovery obligations
- Big 4 experience

**In the News**
LECG experts testify in large, widely publicized cases. Click here for a recent data analysis case covered by the Los Angeles Daily Journal.

]

# LeCG

Experts     Practice Areas     International     Offices     Careers     Investor Relations     About LECG     Contact Us

Electronic Discovery Home
Overview
Partners & Affiliations
Expert Qualifications
Experts

## electronic discovery: data analysis

Only 10 percent of an organization's electronic information is accessible by simple means. At a time when guilt, liability, or vindication is often established by circumstantial evidence such as bid patterns, travel and expense records, telephone records, business diary entries, e-mail, voice mail, or 'deleted' computer files, it is critical to access and control the other 90 percent. As companies face challenges in handling their data, they can call on LECG data analysis experts.

LECG data analysis experts have decades of experience and have testified on obtaining potentially key data from user hard drives, server backup tapes, third party systems. Our experts specialize in locating and collecting large volumes of data that are the subject of disputes, investigations, and litigation. Our experts can then apply search tools to investigate names, companies, transactions, events, phone numbers, and e-mails that answer the question, "who did what, when and how?" Application of more advanced tools can reveal patterns and trends in large, complex databases, such as payroll records, royalty payments, or broker trades.

### Data Analysis Services

- Acquiring data that often nobody else can obtain and work with
- Assessing data integrity
- Cleaning and de-duplicating data and reconciling data anomalies
- Rapidly analyzing large volumes of data
- Designing and executing industry-specific or matter-specific analyses
- Providing support to testifying experts
- Recreating global enterprise-wide systems such as PeopleSoft and Oracle for forensic analysis

### E-mail Analysis

- Gather and analyze e-mail and other electronic records
- Decipher relationships among individuals organizations, events, monetary amounts, meetings, and communications
- Trace and graphically depict relationships, transactions, and communications

LECG data analysis experts have relevant experience and court-approved data production methods. We understand complex data structures, possess strong database skills, and are backed up by powerful processing systems in multiple cities. We know what the courts expect and want.

]

# Exhibit J

## Rosenberg, Sonya

| | |
|---|---|
| **From:** | Tarnow, William J. |
| **Sent:** | Thursday, March 06, 2008 3:40 PM |
| **To:** | 'Risa Morris' |
| **Cc:** | Rosenberg, Sonya |
| **Subject:** | RE: Discovery Issues -- Response to March 4, 2007 Correspondence |
| **Importance:** | High |

Risa:

I should be clearer on the issue of Mr. Kaplan's documents/emails -- or more precisely, the lack thereof.  In this regard, I refer you specifically to your February 28 letter and corresponding document-production summary chart, which your office prepared.  That summary chart confirms that, in fact, LECG produced only a **single** document - - and **no emails** -- relative to the supposed search of Mr. Kaplan's computer.  This facts serves as further evidence that the back-up tapes must be searched in order to obtain all relevant communications/information from the key witnesses, from whom the parties expressly agreed to search for all subject documents several months ago.

Bill


William J. Tarnow
Neal, Gerber & Eisenberg LLP
2 N. LaSalle Street, Suite 2200
Chicago, IL 60602
(312) 269-8489
(312) 429-3573 (fax)
wtarnow@ngelaw.com


www.ngelaw.com

**CONFIDENTIAL NOTE**

THIS E-MAIL TRANSMISSION AND ANY ATTACHMENTS HERETO CONTAIN INFORMATION FROM THE LAW FIRM OF NEAL, GERBER & EISENBERG WHICH IS CONFIDENTIAL AND PRIVILEGED.  THE INFORMATION IS INTENDED FOR THE SOLE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED.  IF YOU ARE NOT THE INTENDED RECIPIENT, YOUR USE, DISSEMINATION, FORWARDING, PRINTING OR COPYING OF THIS INFORMATION IS PROHIBITED.


**TAX ADVICE DISCLOSURE**

ANY TAX ADVICE CONTAINED IN THIS COMMUNICATION (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (I) AVOIDING PENALTIES UNDER THE INTERNAL REVENUE CODE OR (II) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR MATTER ADDRESSED HEREIN.

3/20/2008