UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN I. SALOMON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 07 C 4785 |
| | ) |
| LECG, LLC, | ) Judge Rebecca R. Pallmeyer |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

Defendant LECG, LLC ("LECG") is a global firm in the business of providing independent expert testimony, analysis, and strategic consulting services to businesses, law firms, and government agencies. (Def. Rule 56.1 (b)(3) Statement ¶ 1.) Plaintiff John Salomon was employed by LECG from June 2, 2004 until his resignation on August 17, 2007. (*Id.* ¶ 3.) The terms of Salomon's employment with LECG were governed by a letter agreement dated June 1, 2004 (the "Director Agreement") and a further letter agreement dated April 10, 2006 (the "Amendment"). Under the terms of the Director Agreement, Salomon would forfeit substantial financial benefits if he chose to leave LECG's employ other than for Good Reason, as defined in the agreement. Specifically, the Director Agreement empowered LECG to "claw back" the unamortized portion of Salomon's signing bonus (in the amount of $321,204.34) and to retain the unamortized portion of Salomon's deferred compensation plan ("DCP") (also in the amount of $321,204.34).

In September 2007, Salomon filed this lawsuit, seeking among other things, a declaratory judgment that he had "Good Reason" to terminate his employment with LECG on August 17, 2007. There is no dispute that if Salomon lacked Good Reason for the termination of his employment, LECG is legally entitled to retain the unamortized benefits. The dispute instead centers on whether Good Reason existed and whether Salomon is entitled to relief in the form of recovery of the disputed benefits. Salomon has moved for summary judgment in his favor on this issue, but for the

reasons explained here, the motion is denied.[1]

# **FACTS**

**Contractual Provisions**

Analysis of the parties' dispute begins with the contractual provisions. When Salomon joined LECG in June 2004, his compensation was based primarily on what the Director Agreement referred to as the "Expert Model," a formula by which LECG experts were paid for the consulting work they performed; in addition, Salomon received bonuses for recruitment and development. No fixed salary was included in his compensation package. Salomon was also paid a signing bonus and received contributions to his deferred compensation plan. The Director Agreement provided that portions of the signing bonus and DCP were to be repaid should Salomon leave LECG other than for Good Reason. Good Reason, as defined in the Director Agreement, falls into five categories:

> For purposes of this agreement, "Good Reason" means the following grounds for termination of your employment with LECG: (A) a willful failure by LECG to pay a monetary obligation or monetary obligations exceeding $50,000 in aggregate to you under your Expert Agreement that is not cured within 30 days after written notice from you, as applicable, describing such failure to pay; provided, however, that a failure by LECG to pay a monetary obligation (i) under this Agreement because of a good faith disagreement over the amount owed or (ii) under this Agreement that is the subject of a pending disagreement resolution procedure shall not constitute Good Reason, (B) a material adverse change in your duties, responsibilities or positions which is not cured by LECG within 30 days written notice indicating your objection to any such material adverse change, (C) a material adverse change in the Expert Model or other terms affecting your compensation, which is not generally applicable to all other LECG employees covered under the Expert Model, (D) the breach of any material obligation of LECG to you under this Agreement or any other written agreement or plan relating to your employment which is not cured with 30 days written notice from you describing such breach, and (E) your Death or

---

[1] The court's jurisdiction is secure. The parties are diverse in citizenship: Salomon alleges that he is an Illinois resident and citizen and that LECG is a limited liability company formed under California law whose sole member is LECG Corporation, incorporated in Delaware with its principal place of business in California. The amount in controversy, specifically the compensation to which Salomon claims he is entitled as relief, exceeds $75,000. Because aspects of the employment contract are also governed by the Employee Retirement and Income Security Act, 29 U.S.C. §1001 *et seq.* ("ERISA"), the court has federal question jurisdiction as well.

> Disability (as defined in LECG's long term disability plan).

(Director Agreement, Ex. A to Pl's Mot., at 321.) In January 2006, Salomon was placed on LECG's Executive Management Committee ("EMC"). (Def. Rule 56.1 (b)(3) Stmt. ¶ 15.) The parties dispute whether Salomon's participation on the EMC was intended to be permanent or temporary, but they agree that the Amendment adopted in April 2006 explains how Salomon was to be compensated for his additional responsibilities as a member of the EMC. The "Compensation" portion of the Amendment reads as follows:

> In addition to your Director Earnings as stated in your Employment Agreement, commencing January 1, 2006, you will receive as compensation for your additional responsibilities as a member of the Executive Committee a salary of $250,000 per annum. Because you will be receiving a salary for your recruiting and other responsibilities after January 1, 2006 as a member of the Executive Committee, your Bonus for Practice Development after January 1, 2006 will be modified as set forth below. Except as identified on Exhibit A attached hereto, new hires or acquisitions identified or completed during the period commencing January 1, 2006 and continuing for so long as you are eligible to receive this salary will not be included in the computation of your Bonus for Practice Development. The Salary will be paid according to LECG's regular policies, and both your salary and performance will be reviewed by the Compensation Committee of LECG Corporation ("the Compensation Committee") at the end of an initial eight-month period (approximately September 1, 2006). The Compensation Committee reserves the right to propose modifications to your role on the Executive Committee following such review . . . .

(Amendment, Ex. B to Pl's Mot., at 019.) The Amendment also states that, unless expressly modified, all terms and conditions of the Director Agreement remain in effect. (*Id.* at 022.) The parties do not dispute that the Good Reason provision continued to cover the general terms of Salomon's employment.

**Salomon's Termination**

In February 2007, Michael Jeffery was elevated to the position of Chief Executive Officer of LECG. (Def. Rule 56.1 (b)(3) Stmt. ¶ 21.) On March 5, 2007, Jeffery advised Salomon that

3

Salomon would no longer be a member of the EMC. (*Id.* ¶ 22.)[2] By letter dated March 7, 2007, Salomon advised Jeffery that he considered his removal from the EMC to be a "material, adverse change in [his] duties, responsibilities, or position," giving rise to Good Reason under the terms of the Director Agreement. (*Id.* ¶ 24.) Salomon's letter gave notice that LECG had 30 days to cure under the contract, but made no reference to Salomon's compensation. (Letter, Ex. F to Pl's Mot., at 026-27.) Jeffrey responded on March 16, 2007, asserting that LECG had not adversely changed Salomon's duties, responsibilities, or position by removing him from the EMC. (Def. Rule 56.1 (b)(3) Stmt. ¶ 25.) Then on May 24, 2007, Jeffrey notified Salomon that LECG would no longer pay Salomon's $250,000 salary. (*Id.* ¶ 26.) LECG completely discontinued payment of Salomon's $250,000 salary on June 1, 2007. On July 17, 2007, Salomon gave LECG notice of his decision to resign from LECG's employment. (*Id.* ¶ 27.)

Salomon now moves for partial summary judgment, contending that the Director Agreement and the Amendment are unambiguous and that, by the terms of those agreements, LECG's elimination of Salomon's salary on June 1, 2007 amounted to Good Reason for his resignation. Salomon claims to be entitled to judgment as a matter of law as to the disputed unamortized portions of his signing bonus and DCP account. Although Salomon has identified a number of other circumstances that he believes establish Good Reason for his resignation, as well, he focuses for purposes of this motion solely on LECG's conduct in eliminating his salary, and the court likewise confines its discussion to that issue. For the reasons stated below, the court denies Plaintiff's motion for partial summary judgment.

---

[2] The parties dispute whether Salomon's removal from the EMC was motivated by Jeffery's personal feelings for Salomon or solely as part of a larger restructuring of LECG's organizational structure and management, but this dispute is not material to the motion before the court.

**DISCUSSION**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). In determining whether a genuine issue of material fact exists, a court must consider the evidence in the light most favorable to the nonmoving party. *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008); *Adickes v. S.H. Kress & Co.*, 389 U.S. 144, 157 (1970). At the same time, a party opposing summary judgment must present evidence from which the jury could reasonably find for the non-moving party. *Rozskowiak v. Village of Arlington Hts.*, 415 F.3d 608, 612 (7th Cir. 2005)(and cases cited therein). Construction of a contract is a subject that is particularly suited to disposition by summary judgment. *See Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420 (7th Cir. 1998), c*iting Metalex Corp. v. Uniden Corp. of America*, 863 F.2d 1331, 1333 (7th Cir. 1988).

Salomon's claims with respect to his DCP, as an employee benefit plan, arise under ERISA. Courts construe ERISA claims "in accordance with federal common law . . . and general rules of contract interpretation." *Grun*, 163 F.3d at 419. Salomon's claims with respect to his signing bonus arise under state contract law. The Director Agreement was originally executed in Washington, D.C. Salomon then moved to LECG's Chicago office, where the Amendment was executed. The parties both cite Illinois case law in their briefs and apparently agree that Illinois common law governs the relevant portions of the contract. In any event, the general principles of contract law necessary for the court to address Defendant's motion are the same regardless whether Illinois law or federal common law applies.

It is a fundamental principle of contract law that "clear and unambiguous terms in a contract are given their ordinary and natural meaning." *Interim Health Care of Northern Illinois, Inc. v. Interim Health Care Inc.*, 225 F.3d 876, 879 (7th Cir. 2000)(and cases therein). When interpreting

5

written contracts, a court initially determines, as a matter of law, whether the contract is ambiguous or unambiguous. *See Grun*, 163 F.3d at 419, *citing Ryan v. Chromalloy American Corp.*, 877 F.2d 598, 602 (7th Cir. 1989). "The fact that parties disagree about the meaning of a contractual provision does not mean the contract is ambiguous." *Interim Health Care Inc.*, 225 F.3d at 879. Instead, ambiguity is found only if the contract language is reasonably or fairly susceptible of more than one construction. *Id.* Courts are to construe contracts as a whole, giving meaning to each provision. *Emergency Med. Care, Inc. v. Marion Mem'l Hosp.*, 94 F.3d 1059, 1061 (7th Cir. 1996). If there is some ambiguity in the language of the written agreement that is not disambiguated elsewhere in the document, then a court may consider evidence of the parties' intent that is extrinsic to the written documents, such as oral representations. *Vallone v. CNA Financial Corp.*, 375 F.3d 623, 632-33 (7th Cir. 2004).

Salomon claims the compensation provision of the Amendment unambiguously entitles him to an irrevocable annual salary of $250,000, and that the loss of that salary constituted a "material adverse change in the Expert Model or other terms affecting [his] compensation," under Part (C) of the Good Reason provision of the Director Agreement. As noted earlier, the compensation provision explains that the "salary will be paid according to LECG's regular policies, and both [Salomon's] salary and performance will be reviewed by the Compensation Committee . . . at the end of an initial eight-month period (approximately September 1, 2006). The Compensation Committee reserves the right to propose modifications to [Salomon's] role on the Executive Committee following such review." (Amendment, Ex. B to Pl's Mot., at 019.)

Salomon contends that this language, giving the Compensation Committee the right to "propose modifications," demonstrates that the parties did not agree to any unilateral right on the part of LECG to discontinue Salomon's salary. Instead, Salomon argues, the "propose modifications" language implies that only Salomon's acceptance of such a proposal would make termination of his EMC salary effective. As Salomon himself never agreed to the elimination of his

6

salary, he concludes, LECG's actions constituted Good Reason for his resignation. In support of his reasoning, Salomon cites Black's Law Dictionary for the proposition that *propose* commonly means to "present or offer for consideration." He points out that the Amendment could just as easily have contained phrases such as *"implement modifications"* or *"effect modifications,"* had the parties intended to create an unambiguous unilateral right of modification for LECG. The fact that the parties did not use such alternative language or any specific durational limitation, Salomon urges, requires the conclusion that the salary was not intended to be unilaterally revocable or temporary under the terms of the Amendment and that its elimination therefore constitutes Good Reason.

In response, LECG argues that the salary provided for in the Amendment was indeed intended to be temporary and was subject to review by LECG's Compensation Committee. LECG notes language that contemplates the possibility that Salomon's eligibility to draw a salary might cease: the provision refers to Salomon's compensation formula as "continuing for so long as [Salomon was] eligible to receive this salary." (Amendment, Ex. B to Pl's Mot., at 019.) And, according to LECG, the language reserving LECG's right to review and propose modifications unambiguously establishes a unilateral right to eliminate the EMC salary. As LECG understands the arrangement, Salomon's EMC salary was intended to temporarily replace his existing bonus structure and, upon the elimination of the EMC salary, Salomon's compensation reverted to the bonus structure in place before the Amendment. Thus, LECG insists, elimination or modification of the salary could not give rise to Good Reason under the Director Agreement.

In any event, LECG argues, the salary dispute Salomon cites as Good Reason falls within the scope of Part (A) of the Good Reason provision, not Part (C). Part (A) of the Good Reason provision describes a series of requirements, such as providing notice and opportunity to cure, that must take place before a disputed monetary obligation can constitute Good Reason for Salomon's resignation. Part (A) also makes clear that certain disputes do not constitute Good Reason—for

7

example, when a dispute over a monetary obligation arises in good faith.[3] Part (C) of the provision, on which Salomon relies, has no such requirements or exceptions.

Intrinsic ambiguity exists when the agreement itself is unclear on its face. *Interim Health Care Inc.*, 225 F.3d at 879. For several reasons, the court concludes that the "propose modifications" language is ambiguous, and is not disambiguated by resort to the rest of the Amendment or the Director's Agreement. First, contrary to Plaintiff's contention, the word *propose* admits of more than one "ordinary and natural" meaning. Salomon is correct that *to propose* can mean to make "an offer, by one person to another, of terms and conditions with reference to some work or undertaking . . . . " *Black's Law Dictionary* 1219 (6th ed. 1990). That definition does imply the need for acceptance by another party in order for terms and conditions to become operative. Notably, however, *propose* also commonly means "to form or put forward a plan or intention." *Merriam Webster Collegiate Dictionary* 936 (10th ed. 1997). This latter definition does not imply the need for acceptance by another party. It is unclear from the face of the document which of these two common meanings is intended by use of the term *propose* in the Amendment.

The latter definition appears to make more sense when construed in conjunction with the phrase "for so long as you are eligible to receive this salary." Reading the contract as a whole, as the court must, the provision appears to imply that any *proposed modification* could have as a consequence the result that Salomon would no longer be eligible to receive the salary. As Defendant points out, the contract appears to contemplate such a contingency, as it suggests that the EMC salary was intended to substitute for Salomon's bonus eligibility: "Because you will be receiving a salary for your recruiting and other responsibilities after January 1, 2006 as a member

---

[3] Part (A) of the Good Reason provision refers to a "dispute resolution procedure" in place to resolve conflicts between LECG and its employees. Assuming LECG is correct that its dispute with Salomon falls under Part (A), this case would appear to be a good candidate for such a resolution procedure. There is no indication in the record that any attempt has been made to resolve this dispute outside of this litigation. The court urges the parties to examine potential dispute resolution procedures in conformity with the terms of the contract.

of the Executive Committee, your Bonus for Practice Development after January 1, 2006 will be modified . . . new hires or acquisitions identified or completed during the period commencing January 1, 2006 and continuing for so long as you are eligible to receive this salary will not be included in the computation of your Bonus for Practice Development." (Amendment, Ex. B to Pl's Mot., at 019.)  Thus, LECG asserts, the agreement can fairly be read to imply that, in the event that Salomon became ineligible to receive a salary, his compensation would revert to an alternate bonus computation.

Further, even adopting Plaintiff's preferred definition—that the need for acceptance by another party is implied by the term *propose*—the Amendment is still silent as to whose acquiescence would be required.  The Amendment does not say that the proposals of the Compensation Committee must be accepted *by Salomon* in order to be effective.  If a proposed modification required some entity's acquiescence in order to be effective, the term might just as easily refer to LECG's senior management or some other internal decision maker.  The court is not convinced by Salomon's arguments that it should interpret this silence as the unambiguous creation of a right in Salomon to refuse any modification to his salary or duties under the Amendment.

Indeed, Salomon's interpretation would essentially render LECG's explicit "reservation of right" illusory.  The mere ability to propose (as in "to offer") modifications for acceptance is a right that resides in every contracting party regardless of contract language.  Construction of contracts follows the "general rule of contract interpretation that terms of a contract should not be interpreted so as to render them ineffective or superfluous." *Abraham v. Rockwell Intern. Corp.*, 326 F.3d 1242, 1255 (Fed. Cir. 2003), *citing Restatement (Second) of Contracts* § 203 (a)(1981).  As Defendant points out, Plaintiff's interpretation would result in Salomon having an unfettered right to remain on the EMC, drawing a $250,000 salary, indefinitely for so long as he refused any proposed change—a somewhat awkward result that the court is not convinced was intended.

Salomon is correct that there were alternative word choices that could have served to make

the ambiguous "propose modifications" language more clear. The parties' failure to adopt available alternative language does not, however, require the negative inference that they intended to create a process by which Salomon maintained a veto power over all modifications to his salary. Indeed, any such inference would be inconsistent with the review process and contingencies explicitly provided for in the Amendment.

Nor is the ambiguity created by the word "propose" the only potential basis for denying summary judgment. The parties also dispute what clause of the Good Reason provision of the Director Agreement is applicable here. Plaintiff relies on Part (C) of the provision, which defines Good Reason, in part, as "a material adverse change in the Expert Model or other terms affecting your compensation, which is not generally applicable to all other LECG employees covered under the Expert Model[.]" (Director Agreement, Ex. A to Pl's Mot., at 321.) Defendant contends that Part (A) of the provision, which relates to unpaid monetary obligations, applies. The court need not address the question of which clause of the Good Reason provision applies in order to conclude that disputes concerning the contract's interpretation require that the motion for summary judgment be denied.

**CONCLUSION**

Because the contractual terms on which Plaintiff bases his motion are ambiguous, his motion for partial summary judgment [68] is denied. The parties are again encouraged to discuss settlement.

ENTER:

Dated: September 21, 2009

_____
REBECCA R. PALLMEYER
United States District Judge